In the Matter of the ADOPTION OF Jeremiah HALLOWAY, a person under 18 years of age.

Appeal of NAVAJO NATION.

No. 20519.

Supreme Court of Utah.

Dec. 5, 1986.

Mary Ellen Sloan, Kapaloski, Kinghorn & Peters, Salt Lake City, Craig Dorsay, Window Rock, for appellant.

Richard B. Johnson, Howard, Lewis & Peterson, Provo, for respondents.

ZIMMERMAN, Justice:

The Navajo Nation challenges the jurisdiction of the Utah courts to rule upon a petition for adoption of a Navajo child and related proceedings. We agree that the trial court lacked jurisdiction and vacate its orders granting the petition for adoption and terminating the parental rights of Cecelia Saunders. Any further proceedings relating to the adoption must be

presented to the courts of the Navajo Nation.

This action arises out of an adoption proceeding concerning Jeremiah Halloway commenced in the Fourth District Court for Utah County, Utah. Jeremiah was born on May 14, 1977, to Cecelia Saunders, a full-blooded Navajo enrolled in the Navajo tribe and a domiciliary of the Navajo reservation in Churchrock, New Mexico. Jeremiah lived the first six months of his life with his mother on the reservation, after which he was cared for on the reservation by his maternal grandmother, Bessie Begay.

In March of 1980, a maternal aunt removed Jeremiah from the reservation with the oral consent of his mother and took him to Utah. The record indicates that at the time Jeremiah left the reservation, Cecelia thought he was to be placed temporarily with a foster family, although she had discussed the possibility of adoption with the maternal aunt prior to consenting to his removal. Cecelia learned of Jeremiah's proposed adoption by a non-Indian couple two weeks after he left the reservation.

Two months later, in May 1980, Cecelia executed a consent to adoption before the Fourth District Court for Utah County, Utah. The adoptive parents immediately filed a petition for adoption. In a minute entry acknowledging Cecelia's execution of the consent to adoption, the trial court ordered counsel for the adoptive parents to contact the Navajo tribe and to obtain its consent before proceeding. Notification of the pending adoption proceeding was given to the Navajo Nation approximately five months later.

In May 1982, some two years after the petition for adoption was filed, the Navajo Nation intervened in the adoption proceeding.[1] Acting under the authority of the Indian Child Welfare Act of 1978 ("ICWA"), Pub.L. No. 95–608, 25 U.S.C. §§ 1901–1963 (1982), the Navajo Nation moved to dismiss the proceedings, asserting that the Utah courts lacked jurisdiction to act on the adoption petition and related proceedings because Jeremiah was an Indian child and a domiciliary of the Navajo reservation. Subsection 101(a) of the ICWA provides that *"[a]n Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who ... is domiciled within the reservation of such tribe,* except where such jurisdiction is otherwise vested in the State by existing Federal law." 25 U.S.C. § 1911(a) (1982) (emphasis added).

The trial court denied the motion on July 14, 1982, finding that Jeremiah was domiciled in Utah rather than on the Navajo reservation "based upon the fact that the child's residence appears to have been voluntarily and purposely [sic] removed from the natural mother, grandmother and reservation to the [adoptive parents]." The trial court then stated that in view of the change in the child's domicile and the long period of time that Jeremiah had been with his adoptive parents, "this court finds that apparent 'good cause' exists for this court to take jurisdiction and that the requirements of the Indian Child Welfare Act have ... been satisfied." In so ruling, the trial court presumably was relying upon subsection 101(b) of the ICWA as its authority to assert jurisdiction. That section provides that adoption proceedings involving Indian children *not* domiciled upon the reservation shall be transferred to the child's tribe upon request, unless good cause for retaining jurisdiction exists. 25 U.S.C. § 1911(b) (1982).[2]

---

**1.** At oral argument, counsel for the tribe argued without contradiction that part of the reason for the long delay before the tribe's formal intervention in the proceedings was due to the lack of any tribal mechanism for handling Indian child custody disputes. That problem has since been resolved. In addition, according to counsel, the tribe was attempting to negotiate informally for the child's return during the two years before it formally intervened.

**2.** Subsection 101(b) provides:

 In any State court proceeding for the ... termination of parental rights to an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, *in the absence of good cause to the*

The tribe sought reconsideration of the court's determination that it had jurisdiction over Jeremiah. Two additional hearings were held, and on October 6, 1983, the court reaffirmed its July 1982 decision. The court found that "the relocation of the child with [the adoptive couple] was done with the intent to transfer to [the adoptive couple] full parental rights ... and with the further intent to abandon all parental rights in the child." It also concluded that the adoptive couple stood *in loco parentis* to the child as of July 1982. Therefore, the court concluded that Jeremiah was domiciled in Utah, and the Utah court had jurisdiction over the matter. The court declined to pass on the merits of the adoption petition, but advised the parties that it intended to follow the provisions of the ICWA in ruling upon the petition and stated that the adoptive parents would be required to prove beyond a reasonable doubt that "continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child," as required by subsection 102(f) of the ICWA. 25 U.S.C. § 1912(f) (1982). The trial court also acknowledged that prior to its decision, Cecelia had withdrawn her consent to adoption.

A hearing on the petition for termination of Cecelia's parental rights was finally scheduled for October 22, 1984, one year after the Utah court's second jurisdictional ruling. Ten days before the hearing date, the District Court of the Navajo Nation for Window Rock, Arizona, handed down a decision finding that Jeremiah had been domiciled within the boundaries of the Navajo reservation at all relevant times and that the Navajo tribe had exclusive jurisdiction to determine his custody under tribal statutes, common law, and the ICWA. The Navajo Nation immediately filed a motion with the Utah court requesting that it give full faith and credit to the tribal court's order and dismiss the Utah proceedings. The tribe relied upon subsection 101(d) of the ICWA, which provides:

[E]very State ... shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity.

25 U.S.C. § 1911(d) (1982).

At the October 22, 1984, hearing, the trial court denied the Navajo Nation's motion on grounds that it was untimely and proceeded with the adoption matter. On January 28, 1985, the court handed down

---

*contrary,* shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided,* That such transfer shall be subject to declination by the tribal court of such tribe.

25 U.S.C. § 1911(b) (1982) (emphasis added). "Good cause" is defined in the Guidelines for State Courts; Indian Child Custody Proceedings. These guidelines represent the interpretation of various ICWA provisions by the Bureau of Indian Affairs of the Department of the Interior. 44 Fed.Reg. 67584 (1979) (not codified). Under the guidelines, "good cause" is defined as follows:

(a) Good cause not to transfer the proceeding exists if the Indian child's tribe does not have a tribal court as defined by the Act to which the case can be transferred.

(b) Good cause not to transfer the proceeding may exist if any of the following circumstances exists:

(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.

(ii) The Indian child is over twelve years of age and objects to the transfer.

(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.

(iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.

(c) Socio-economic conditions and the perceived adequacy of tribal or Bureau of Indian Affairs social services or judicial systems may not be considered in a determination that good cause exists.

(d) The burden of establishing good cause to the contrary shall be on the party opposing the transfer.

*Id.* at 67583, 67591.

its ruling. The court granted the adoption petition, finding as follows:

(1) That the evidence (including expert testimony) established beyond a reasonable doubt that to return Jeremiah to his Indian custodians would result in serious emotional or physical damage to him;

(2) That active efforts have been undertaken to attempt the rehabilitation of the Indian family and have failed; and

(3) That the biological mother knowingly and voluntarily abandoned the child as defined in Utah Code Annotated 78–3a–48(1).[3]

This appeal followed.[4]

The Navajo Nation raises a number of challenges to the trial court's rulings, but the pivotal issue is whether the Utah court properly decided that it had jurisdiction. Because it did not, this appeal may be resolved without reaching the remaining issues.

In determining the correctness of the trial court's assumption of jurisdiction over Jeremiah, we must look to federal law, for the ICWA grants state courts jurisdiction to act regarding Indian child custody and adoption matters under only limited circumstances, while it grants tribal courts broad jurisdiction over such matters. The pivotal provisions of the ICWA are subsections 101(a) and (b). 25 U.S.C. § 1911(a), (b) (1982). Subsection 101(a) grants an Indian tribe *exclusive* jurisdiction over child custody proceedings when they involve a child "who resides or is domiciled within the reservation of such tribe." 25 U.S.C. § 1911(a) (1982). And even when the Indian child is not residing or domiciled within the reservation, subsection 101(b) provides that a state court must transfer any custody proceeding concerning such an Indian child to the courts of the child's tribe if the tribe so requests, unless the state court determines that good cause exists for refusing to make the transfer. 25 U.S.C. § 1911(b) (1982).

These provisions are at the heart of the ICWA. The ICWA was passed in 1978 in response to congressional findings that

an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

. . . .

. . . the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901(4), (5) (1982). The broad grant of jurisdiction to tribes and the narrowing of state court authority were aimed

---

3. The trial court's findings 1 and 2 were made in response to the requirements contained in subsections 102(d) and (f) of the ICWA, which provide:

(d) Any party seeking to effect a . . . termination of parental rights to an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

. . . .

(f) No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. 25 U.S.C. § 1912(d), (f) (1982).

4. During the pendency of the appeal to this Court, the tribe filed an action in the United States District Court for the District of Utah against the state district court, the trial judge, and the adoptive parents, alleging various constitutional and statutory violations. On September 30, 1985, the federal court granted summary judgment against the tribe, holding, in pertinent part, that the domicile issue was pending before the Utah Supreme Court and, therefore, was not ripe; that the claims for declaratory judgment and relief for civil rights violations were likewise not ripe; and that the Utah court was not required to relinquish jurisdiction to the tribal court as a matter of full faith and credit.

at preventing these perceived evils. The importance of tribal primacy in matters of child custody and adoption cannot be minimized, for the ICWA is grounded on the premise that tribal self-government is to be fostered and that few matters are of more central interest to a tribe seeking to preserve its identity and traditions than the determination of who will have the care and custody of its children. H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 19, *reprinted in* 1978 U.S.Code Cong. & Ad.News 7530, 7541; *cf. Wakefield v. Little Light,* 276 Md. 333, 347 A.2d 228, 234 (1975).

In the present case, the propriety of the trial court's assumption of jurisdiction turns on Jeremiah's domicile at the time these proceedings were initiated. The trial court asserted jurisdiction under subsection 101(b) of the ICWA after having determined that Jeremiah was not a domiciliary of the reservation. The determination that Jeremiah was not domiciled on the reservation was based upon the trial court's finding that Jeremiah's mother had sent him off the reservation with the intent to abandon her parental rights, an act that transferred his domicile to that of his adoptive parents. If, in fact, the trial court's determination of domicile was correct, subsection 101(b) is applicable and the state court properly could exercise jurisdiction under the conditions set out in that section. However, if Jeremiah was a domiciliary of the reservation, subsection 101(a) is the applicable provision and the tribe had exclusive jurisdiction. Under those circumstances, the state court would not have had any right to proceed.

Because federal law is supreme, the jurisdictional provisions contained in the federal statute are controlling where applicable. *See* U.S. Const. art. VI, cl. 2; *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 326–27, 4 L.Ed. 579 (1819). The ICWA does not expressly define how domicile is to be established. The Bureau of Indian Affairs' guidelines for implementing the ICWA, however, state that

> definitions [of domicile] were not included [in the Act or the guidelines] because these terms are well defined under exist-

ing state law. *There is no indication that these state law definitions tend to undermine, in any way, the purposes of the Act.*

44 Fed.Reg. 67583, 67585 (1979) (not codified) (emphasis added).

The law of domicile applicable here is well-established. At birth, an illegitimate child acquires the domicile of his or her mother. *Morse v. Steed,* 7 Utah 2d 312, 314, 324 P.2d 773, 775 (1958); Restatement (Second) of Conflict of Laws § 22, comment c (1971). If the parents abandon the child, the child acquires the domicile of the party who stands *in loco parentis* to him or her and with whom he or she lives at the time of abandonment. Restatement (Second) of Conflict of Laws § 22, comment i (1971). However, unless a child is abandoned, or his or her domicile is otherwise lawfully changed, the child retains the mother's domicile, even if he or she lives apart from her. Restatement (Second) of Conflict of Laws § 22, comment c (1971).

Under these principles, Jeremiah was a domiciliary of the Navajo Nation and subject to its exclusive jurisdiction from his birth at least until he was removed from the reservation by his aunt. The critical issue is whether Jeremiah's domicile changed upon his removal from the reservation in March of 1980. After hearing testimony from all concerned, the trial court found that Cecelia intended to abandon the child, either when he was first sent off the reservation or shortly thereafter, but in any event before she appeared before the trial court to sign the consent to adoption in May of 1980. The Navajo Nation challenges this finding.

 As a general matter, abandonment occurs when a parent deserts a child or places a child with another with an intent to relinquish all parental rights and obligations. *See Wilson v. Pierce,* 14 Utah 2d 317, 383 P.2d 925 (1963). And the intent to abandon or the actual physical abandonment must be shown by clear and convincing evidence. *Robertson v. Hutchison,* 560 P.2d 1110, 1112 (Utah 1977); Restatement

(Second) of Conflict of Laws § 22, comment e (1971). The record before us indicates that there is sufficient evidence to support the trial judge's finding of abandonment sometime before the May 1980 consent to adoption was executed.

■ When Cecelia gave Jeremiah to her sister for removal from the reservation, she did not express an intent to abandon Jeremiah or conduct herself in such a way as to indicate that she intended to relinquish her parental rights. Although the adoptive father testified that the aunt had made adoptive placement arrangements prior to taking Jeremiah off the reservation, the aunt denied this. And Cecelia testified that while she and the aunt had discussed the possibility of placing Jeremiah for adoption, she understood that Jeremiah was being placed on a temporary basis in a foster home. Therefore, when Jeremiah initially was removed from the reservation, his domicile did not change. Had any questions relating to his custody been raised by any party immediately after the initial removal, the determination of those questions would have been within the exclusive province of the Navajo courts. *See* 25 U.S.C. § 1911(a) (1982).

Two weeks after Jeremiah was removed from the reservation, however, his mother learned that he was in an adoptive home and that adoption was contemplated, yet she permitted him to remain there. Although the matter is not free from doubt, we consider that on the basis of these facts, the trial court properly could find, as it did, that Jeremiah's natural mother abandoned him prior to appearing in the Utah court in May of 1980 and signing the consent to adoption. Under traditional rules of law, Jeremiah's domicile would have changed from the reservation to Utah County at that time. It is upon that premise that the trial court apparently based its decision.

■ As noted earlier, questions of domicile were left to be decided under state law. However, this was only because Congress saw no apparent conflict between state domicile law and the purposes of the ICWA. As the Bureau of Indian Affairs' guidelines note when referring to the fact that state domicile law governs under the ICWA, "[t]here is no indication that these state law definitions tend to undermine, in any way, the purposes of this Act." There certainly is nothing in the ICWA or its legislative history to suggest that state law controls if, in application, its subtleties bring it into conflict with the ICWA in ways that Congress apparently did not foresee. Under general supremacy principles, state law cannot be permitted to operate "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67–68, 61 S.Ct. 399, 404–405, 85 L.Ed. 581 (1941). If it does, state law is preempted. *Id.* at 73–74, 61 S.Ct. at 407–408. And even if Congress did not intend to preempt state domicile law, state law must bow when the application of that law brings the state and federal policies into conflict. *See, e.g., Perez v. Campbell*, 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971).

The Supreme Court has made it clear that where Indian affairs are concerned, a broad test of preemption is to be applied. In *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983), the Supreme Court stated: " 'The unique historical origins of tribal sovereignty' and the federal commitment to tribal self-sufficiency and self-determination make it 'treacherous to import ... notions of pre-emption that are properly applied to ... other [contexts].' " 462 U.S. at 334, 103 S.Ct. at 2386 (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980)). The Court went on:

> By resting pre-emption analysis principally on a consideration of the nature of the competing interests at stake, our cases have rejected a narrow focus on congressional intent to pre-empt state law as the sole touchstone.... *State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal*

*interests reflected in federal law,* unless the state interests at stake are sufficient to justify the assertion of state authority. *Id.* (emphasis added). In considering the "federal and tribal interests" at stake in such an analysis,

> traditional notions of Indian sovereignty provide a crucial 'backdrop' ... against which any assertion of state authority must be assessed. Moreover, both the tribes and the Federal Government are firmly committed to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes.

*Id.* at 334–35, 103 S.Ct. at 2386–87 (citations and footnote omitted).

In this case, the interrelationship of Utah's domicile law and Utah's abandonment law operates to deprive the Navajo Nation of the exclusive jurisdiction over Jeremiah which subsection 101(a) of the ICWA otherwise confers upon it. We think, based on the ICWA's stated purposes and its jurisdictional provisions, that Congress intended that as a general principle, Indian tribes should have authority to determine custody issues involving Indian children. With respect to those resident on reservations, the tribes' jurisdiction is exclusive. 25 U.S.C. § 1911(a) (1982). Congress recognized that some Indian children are resident off of the reservation. However, even with respect to these children, it mandated that state courts cede jurisdiction to tribal courts except where certain very stringent criteria were satisfied. *Id.* at § 1911(b). In effect, Congress used the domicile of the child as a basis for distinguishing between those who maintain close ties with the tribe and, therefore, should be subject to its exclusive control and those who are sufficiently removed from the tribe and its ways to justify giving jurisdiction over them to non-Indian courts in certain circumstances. This is not an illogical assumption since, like Utah, most states hold that a minor child's domicile is that of his or her parents. *See* 25 Am.Jur.2d *Domicile* § 63 (1966). But, here, through the application of the law of abandonment that operates to change a minor child's domicile, the domicile of Jeremiah's mother is no longer attributable to him; instead, he assumes the domicile of his non-Indian parents. The obvious ease with which abandonment law can be used to shift the domicile of a reservation domiciliary's minor child and to thwart the jurisdictional rationale of the ICWA indicates that this interplay of domicile and abandonment law was not foreseen by Congress.

In this case, Jeremiah, a reservation domiciliary, was removed from the reservation and placed for adoption with non-Indians with the clear intent of circumventing the right granted the tribe by the ICWA to exclusive control over Jeremiah's custody. Jeremiah's aunt testified that she concealed her intention to remove Jeremiah from the reservation from the Navajo Division of Social Welfare despite her knowledge that the Division was attempting to handle Jeremiah's situation at the time. She explained that if the Division had learned of her concerns about Jeremiah's being raised by his maternal grandparents, it might have placed him in another Indian home on the reservation. She testified that she did not want him placed in an Indian home because she thought that other Indian homes would have drinking problems similar to those plaguing Jeremiah's family and that Jeremiah could learn about his Indian heritage later. The tribe learned of Jeremiah's proposed adoption only after the Utah court had found that the child's domicile had shifted to Utah, thus providing the state court with jurisdiction over him pursuant to the ICWA. The tribe was informed of both the proposed adoption and Jeremiah's new domicile by the notice sent at the direction of the Utah court. The tribe received this notice approximately five months after Jeremiah's mother executed the consent to adoption and seven months after Jeremiah had been removed from the reservation.

By taking Jeremiah off the reservation and placing him in an adoptive home, the aunt took all the steps necessary to effect a change of his domicile under Utah law before Cecelia was brought to Utah County to sign a consent to adoption. By a confluence of actions, therefore, Jeremiah's aunt,

mother, and adoptive parents managed to remove him from the exclusive jurisdiction granted the Navajo courts by subsection 101(a) of the ICWA and to trigger the alternative jurisdictional provisions of subsection 101(b). By invoking subsection 101(b), the adoptive parents were later able to persuade the Utah court to retain its jurisdiction over Jeremiah despite protestations by the tribe and by Jeremiah's mother who, by this time, had revoked her consent to adoption. Thus, by the actions they took in removing Jeremiah from the reservation, the aunt, mother, and adoptive parents effectively conferred jurisdiction upon the Utah court, a court which quite frankly might be expected to be more receptive than a tribal court to Jeremiah's placement with non-Indian adoptive parents. Yet this receptivity of the non-Indian forum to non-Indian placement of an Indian child is precisely one of the evils at which the ICWA was aimed. *See* H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 21, *reprinted in* 1978 U.S.Code Cong. & Ad.News 7530, 7532–33.

The shifting of Jeremiah's domicile by abandonment also frustrated another provision of the ICWA. Under subsection 103(a), a parent cannot validly consent to a termination of parental rights unless such consent is "executed in writing and recorded before a judge of competent jurisdiction." 25 U.S.C. § 1913(a) (1982). Had Cecelia's consent to adoption been sought at the time Jeremiah was still on the reservation, the only court of competent jurisdiction would have been a Navajo Nation court. Such a proceeding would have alerted the tribe to the plan to remove the child from the reservation and would have given the tribe an opportunity to assert its interest and to invoke the exclusive jurisdiction of the tribal court.

To the extent that Utah abandonment law operates to permit Jeremiah's mother to change his domicile as part of a scheme to facilitate his adoption by non-Indians while she remains a domiciliary of the reservation, it conflicts with and undermines the operative scheme established by subsections 101(a) and 103(a) to deal with children of domiciliaries of the reservation and weakens considerably the tribe's ability to assert its interest in its children. The protection of this tribal interest is at the core of the ICWA, which recognizes that the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents. This relationship between Indian tribes and Indian children domiciled on the reservation finds no parallel in other ethnic cultures found in the United States. It is a relationship that many non-Indians find difficult to understand and that non-Indian courts are slow to recognize.[5] It is precisely in recognition

---

**5.** The tribe's unique and independent interest in its children was recognized prior to the enactment of the ICWA. In *Wisconsin Potowatomies of the Hannahville Indian Community v. Houston*, 393 F.Supp. 719 (W.D.Mich.1973), the court considered whether a Michigan state court or the tribe had jurisdiction to determine the custody of orphaned half-blood Indian children who were enrolled members of the Potowatomie tribe. Although the children were living off the reservation when their parents died, the court found that domicile rather than residence was determinative of jurisdictional authority and that the children were domiciled on the reservation. Finding that the tribe was authorized under federal constitutional and common law to determine the children's custody, the court explained: "If tribal sovereignty is to have any meaning at all ... it must necessarily include the right, within its own boundaries and membership, to provide for the care and upbringing of its young, a *sine qua non* to the preservation of its identity." *Id.* at 730.

The facts in *Wakefield v. Little Light*, 276 Md. 333, 347 A.2d 228 (1975), are more closely on point. In *Wakefield*, an Indian mother granted a non-Indian couple permission in writing to "take [her child] with them and be responsible for him wherever they are" and even joined in a petition to have the child declared neglected and made a ward of the Crow court. The non-Indian custodians were appointed guardians by the Crow court and thereafter moved to Maryland. Approximately one year later, they filed a petition for permanent custody with the Maryland court. The Maryland Court of Appeals held that the Maryland courts should not exercise jurisdiction, despite the significant contacts that the child had off of the reservation. The court stated that "there can be no greater threat to 'essential tribal relations' and no greater infringement on the right of the Crow tribe to govern themselves than to interfere with tribal control over the custody of their children." *Id.* at 237–38. The court further acknowledged that "the special vestiges of Indian sovereignty ...

of this relationship, however, that the ICWA designates the tribal court as the exclusive forum for the determination of custody and adoption matters for reservation-domiciled Indian children, and the preferred forum for nondomiciliary Indian children. Utah abandonment law cannot be used to frustrate the federal legislative judgment expressed in the ICWA that the interests of the tribe in custodial decisions made with respect to Indian children are as entitled to respect as the interests of the parents.

In reaching the conclusions that Utah law is superseded, we recognize that we are not literally adhering to the Bureau of Indian Affairs' guidelines which provide that state law is to be relied upon in defining the term "domicile" as it is used in the ICWA. 44 Fed.Reg. 67583, 67585 (1979) (not codified). Yet, as the Bureau itself stated in its introduction to the guidelines, "[p]rimary responsibility for interpreting ... language used in the Act [other than that delegated expressly to the Secretary of the Interior] ... rests with the courts that decide Indian child custody cases." *Id.* at 67584. In construing the ICWA's terms, administrative interpretation is important, but it is not controlling. *Id.* (citing

*Batterton v. Francis,* 432 U.S. 416, 424–25, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977)). And, as noted earlier, even the Bureau's guidelines implicitly recognize that if a state law definition of domicile "tend[s] to undermine, in any way, the purposes of the [ICWA]," it would not be appropriate to use it. *Id.* at 67585. By relying on the Utah definition of domicile, but ignoring, for ICWA purposes only, the effect abandonment has on that definition, we are complying with what we determine to be Congress's intent that tribal courts have exclusive jurisdiction in child custody cases over the minor children of their reservation domiciliaries.[6] Following this analysis, Jeremiah was domiciled on the reservation and was subject to the tribal court's exclusive jurisdiction under subsection 101(a) of the ICWA. Therefore, the Utah court lacked jurisdiction and its orders were void. Any further proceedings regarding Jeremiah's custody or adoption must be had in the Navajo courts.[7]

Our ruling is supported by two other state courts which have considered the reach of the ICWA's jurisdictional provisions under nearly identical fact situations. Neither court found that the removal of an

---

reinforce the policy not to easily imply the guardian's authority to shift domicile to another state." *Id.* Congress explicitly affirmed the holdings of both Wakefield and Wisconsin Potowatomies in enacting the ICWA. H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 21, *reprinted in* 1978 U.S.Code Cong. & Ad.News, 7530, 7544.

6. Of course, if the mother had changed her domicile from the reservation, then the domicile of her child also would have changed. Under such circumstances, subsection 101(b) properly would apply and a state court would have jurisdiction over child adoption and custody matters, at least to the extent that it found that transfer to the tribe was not required by that section.

7. Justice Stewart concurs in this result, but on the ground that pursuant to subsection 103(c) of the ICWA, the trial court should have returned Jeremiah to his mother on the reservation when she revoked her consent to adoption, which she did prior to the entry of the adoption decree. Justice Stewart reasons that had the court returned Jeremiah to the reservation at that point, Jeremiah would have become a domiciliary of

the reservation and thus would have been subject to the tribal court's exclusive jurisdiction under subsection 101(a). Justice Stewart's opinion must be based on the assumption that Cecelia did not abandon Jeremiah pursuant to Utah law, for the validity of Cecelia's consent and, consequently, the revocation of her consent depend upon her legal authority with respect to Jeremiah. Once a court determines that a parent has abandoned a child, the parent is stripped of his or her authority over the child, and any consent to adoption the parent might offer is superfluous. U.C.A., 1953, § 78–30–5 (1977 ed.); *see, e.g., In re McKinstray,* 628 P.2d 1286 (Utah 1981). Here, therefore, if Cecelia did not abandon Jeremiah, his domicile never would have shifted away from the reservation and the tribe would have had exclusive jurisdiction over him pursuant to subsection 101(a) of the ICWA. Under that scenario, there would be no need to resort to Justice Stewart's analysis to rule in favor of the Navajo Nation. If, however, Cecelia did abandon Jeremiah under Utah law, neither her consent to adoption nor the revocation of that consent was valid, and the Utah court's refusal to return Jeremiah to the reservation based on her revocation was proper.

Indian child from the reservation for adoption purposes changed the child's domicile so as to defeat the tribe's exclusive jurisdiction. In *In re Pima County Juvenile Action No. S–903*, 130 Ariz. 202, 635 P.2d 187 (Ariz.Ct.App.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982), the Arizona Court of Appeals held that an Indian child born on the reservation to a domiciliary of the Navajo reservation retained the reservation domicile and was subject to the exclusive jurisdiction of the Navajo courts, despite the fact that the mother had consented to the child living with the prospective adoptive parents off the reservation at the time the proceedings were initiated.[8] Similarly, in *In re Baby Child*, 102 N.M. 735, 700 P.2d 198 (N.M.Ct. App.1985), the New Mexico Court of Appeals concluded that an illegitimate child born to a mother domiciled within the Pueblo of Laguna was a domiciliary of that Pueblo, even though the mother had signed a consent to adoption in favor of non-Indian parents and, at the time of the appellate court's ruling, the child had been living with the adoptive parents away from the Pueblo for two years. Applying state domicile law, the New Mexico court held that the illegitimate child assumed its mother's domicile at birth.[9] Any actions affecting the child's custody, therefore, were within the exclusive jurisdiction of the tribal courts.[10]

In reaching the conclusion that the Navajo Nation has exclusive jurisdiction over Jeremiah, we are acutely aware that this decision, if it ultimately results in the removal of Jeremiah from his current home, will disrupt the strong emotional bonds which have developed between Jeremiah and his adoptive parents over the past six years and can result only in a great deal of pain and anguish. Unfortunately, the legal system is ill-equipped to deal with these very real problems. Judicial and administrative delays in this case have hindered a timely resolution of the legal issues, and during this time Jeremiah has developed a stable and ever-deepening relationship with his custodial parents.

■ The adoptive parents argue that we should consider the bonding that has taken place between themselves and Jeremiah in reaching a decision in this matter. While stability in child placement should be a paramount value, *Fontenot v. Fontenot*, 714 P.2d 1131 (Utah 1986), it cannot be the

---

**8.** In *Pima County*, the court, although analyzing the domicile issue, did state that in enacting the ICWA, Congress "replac[ed] the outmoded geographical concepts of presence or domicile with a jurisdictional standard based on the ethnic origin of the child." *Id.* 130 Ariz. at 204, 635 P.2d at 189. We do not agree that Congress completely disregarded domicile as a basis for fixing jurisdiction; it remains an important concept. *See* 25 U.S.C. § 1911(a), (b) (1982); *see also* n. 5, *supra*. However, we do agree with the Arizona court's conclusion with respect to the tribe's jurisdiction over the child.

**9.** New Mexico law, similar to Utah's, mandates that a child who is orphaned or abandoned by both parents is domiciled in the place to which he or she is most closely related, which generally is at the home of the person who stands *in loco parentis* to the child. *Montoya v. Collier*, 85 N.M. 356, 359, 512 P.2d 684, 687 (1973) (abandonment concept adopted in dicta). On the facts presented, the court in *Baby Child* need not have, and did not, reach the question whether by abandonment, Indian parents can change their child's domicile under New Mexico law and thereby circumvent the jurisdiction of the tribal courts under the ICWA. In *Baby Child*, the Indian mother consented to place her child for adoption, but she did not, nor did the father, previously abandon that child. Thus, that case is distinguishable from the present one on that factual and legal basis.

**10.** Initially, the child's father and the Pueblo moved to dismiss the action on grounds of lack of jurisdiction before the New Mexico trial court. The trial court denied that motion and subsequently entered a decree of adoption. The father and the Pueblo moved for relief from the decree under Rule 60(b) of the New Mexico Rules of Civil Procedure, and the trial court denied that motion. The father and the Pueblo then sought and were denied a writ of prohibition from the New Mexico Supreme Court. The denial of the writ was appealed to the United States Supreme Court. The Supreme Court noted probable jurisdiction over the appeal, *In re Baby Child*, 102 N.M. at 736, 700 P.2d at 199, but the matter was rendered moot by the cited opinion of the New Mexico Court of Appeals finding, on appeal from the trial court's denial of the father and the Pueblo's motion for relief from the decree of adoption under Rule 60(b), that the New Mexico courts lacked jurisdiction.

sole yardstick by which the legality of a particular custodial arrangement is judged. Such a standard would reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation. In any event, here we have no choice in the matter: federal law prohibits the Utah courts from exercising jurisdiction. Instead, we must defer to the experience, wisdom, and compassion of the Navajo tribal courts to fashion an appropriate remedy. We hope that the tribal courts will consider the tribe's slow response to the notice of the Utah adoption proceeding as well as the value of stability in child placement and will recognize the strong bonds Jeremiah has developed with his adoptive parents.

The Navajo Nation now has established its exclusive right to determine Indian child custody matters. Having established that right, we are confident that the courts of the Navajo Nation will give the petition for adoption the careful attention it deserves and will act with the utmost concern for Jeremiah's well-being.[11]

HALL, C.J., and DURHAM, J., concur.

STEWART, Associate Chief Justice: (concurring in result).

I concur in the result reached by the majority, but for a different reason. Section 1913(c) of Title 25 U.S.C. (1982), which is part of the Indian Child Welfare Act, states:

> In any voluntary proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption,

as the case may be, and the child shall be returned to the parent.

In this case, Cecelia, the natural mother, consented in open court to Jeremiah's adoption on May 30, 1980. Some two years later, on April 30, 1982, but before a judicial termination of her parental right or the entry of an adoption decree, she revoked her consent and requested that Jeremiah be returned to her. Despite the mandatory language of § 1913(c), the trial court did not order the child returned to its mother. Rather, the trial court, apparently *sua sponte*, converted the voluntary termination proceeding into an involuntary proceeding and awarded temporary custody of Jeremiah to the putative adoptive parents. Thereafter, the court granted the petition for adoption.

The ICWA does not provide that upon a natural parent's revocation of his or her consent to adopt, a court may order that the child may be placed in temporary custody with someone other than the natural parent pending a determination of the natural parent's fitness. Rather, it states that "the child *shall be* returned to the parent" upon revocation of consent. (Emphasis added.) The Navajo tribal court would have had exclusive jurisdiction, had Jeremiah been returned to his natural mother as mandated by the statute when the natural mother revoked her consent. The state trial court erred, therefore, in not ordering the child returned to his mother or the tribe.

I do not concur in the majority opinion because I believe that the majority's holding concerning Jeremiah's domicile is incorrect. In my view, the trial court initially exercised jurisdiction over Jeremiah in a proper manner and, but for the effect of 25 U.S.C. § 1913(c), correctly concluded that Jeremiah's domicile was in Utah, thereby

---

**11.** An innovative approach to adoption, called an open adoption, is gaining increased recognition among professionals in the adoption field and may be suited to this case. A fundamental concept of an open adoption is to allow some communication between adoptive and natural parents and, when appropriate, to permit communication between the natural parent and the child as the child grows up. *See generally* S. Arms, *To Love and Let Go* (1973). This approach presents some creative possibilities in the instant case: an arrangement might be reached which would allow Jeremiah to remain with his adoptive parents but also would permit the tribe to teach the child about his Indian heritage. We make this statement as an observation only, recognizing that the matter is not ours to decide.

making him subject to adoption. Furthermore, the Navajo tribe's waiting two years after notice to make an appearance in the Utah court amounted to a waiver of the tribe's rights.

The majority argues in footnote 7 that I assume that Cecelia could validly consent to the adoption and thereafter revoke that consent and that that assumption presupposes an absence of abandonment on her part. The authorities cited by the majority for the proposition that an abandonment precludes a valid consent to an adoption are not on point. At the time of both the consent and the revocation, no final decree of abandonment had been entered by the trial court. Under those circumstances, both the consent and the revocation were clearly valid for the legal effect that Cecelia intended. After the revocation of consent, the trial court in effect made the finding that Jeremiah had been abandoned.

Under the circumstances, the majority's expansive employment of the preemption doctrine is not justified by the ICWA in this case. Certainly state courts must, and do, have jurisdiction over adoption proceedings of Indian children in some cases. Here, the tribe showed no interest in the child for over two years and the child's parent had plainly abandoned him, as even the majority concedes. I do not believe that the trial court was without jurisdiction under those circumstances.

HOWE, Justice: (dissenting).

I disagree with the majority that Cecelia's acts of abandonment did not deprive the Navajo tribe of jurisdiction.

The majority opinion concedes that the evidence supports the determination of the trial court that Cecelia intended to abandon her child, either when he left the reservation or shortly thereafter, but in any event before she appeared to sign the consent to adoption in May of 1980. Then the majority opinion proceeds to apply the "special provisions of the ICWA" to reverse the trial court and conclude that Cecelia's acts of abandonment did not deprive the tribe of jurisdiction.

The majority opinion states that the ICWA does not expressly define how domicile is established under the act. It accepts the guideline of the Bureau of Indian Affairs for implementing the ICWA, which states that definitions of domicile were not included in the act because these terms are well-defined under existing state law. "There is no indication that these state law definitions tend to undermine, in any way, the purposes of the act." However, contrary to the above statement, the majority then attempts to demonstrate how state definitions do undermine the act, and concludes that Utah's common law of domicile is pre-empted by the ICWA. I cannot accept that reasoning. I believe that the BIA guideline means exactly what it says and that the trial court properly applied Utah case law on domicile.

It is frequently pointed out that America is a mobile nation. Our Indian people are no exception. Indian people are perhaps even more mobile because of the fact that it is increasingly difficult for them to make a living within the confines of their reservations. Many of the cities and towns in Utah have Indian residents who frequently return to the reservation to visit relatives and perhaps care for property there. Much like students and others who come and go, the domicile of Indians must be determined on an individual case basis. I find the majority opinion to be unpersuasive as to why special rules need to be applied to Indian people respecting their domicile. The purposes of the ICWA, much like our state laws on taxation and elections, will not be defeated because of the mobility of our nation.