[Nos. D024180, D024517. Fourth Dist., Div. One. Mar. 7, 1996.]

In re LARISSA G. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Plaintiff and Respondent, v.
GINA L., Defendant and Appellant;
NAVAJO NATION, Intervener and Respondent.

**[Opinion certified for partial publication.[1]]**

___
[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III, V and VI.

COUNSEL

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Lloyd M. Harmon, Jr., County Counsel, John J. Sansone, Acting County Counsel, Susan Strom, Chief Deputy County Counsel, and Gary Seiser, Deputy County Counsel, for Plaintiff and Respondent.

California Indian Legal Services, James E. Cohen and Nancy S. Rank, for Intervener and Respondent.

Christopher Blake, upon the request of the Court of Appeal, for Minors.

OPINION

KREMER, P. J.—

### INTRODUCTION

In this dependency case, Gina L. appeals the juvenile court's six-month review order suspending her visits with her minor children Larissa and Michael G. and its subsequent order transferring jurisdiction to the Navajo Nation (Nation) pursuant to the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).[2] As to the first order, Gina contends there was insufficient evidence that continuing visitation would be detrimental to the children, the court improperly vested discretion regarding resumption of

---

[2]All statutory references are to the United States Code designations of the ICWA unless otherwise specified.

visits in the department of social services (DSS) and a therapist, and the court erroneously required her to participate in a substance abuse program and testing. We agree there was insufficient evidence to support the suspension of visits and reverse and remand for a hearing on this issue. As to the second order, Gina contends her objection and good cause precluded the transfer of jurisdiction, the court erred in ordering the children placed with paternal relatives on a reservation in Arizona, and it erred in finding that the ICWA applied before determining paternity. We conclude that while the court did not err in placing the children in Arizona and the contention regarding application of the ICWA is moot, the court erred in transferring jurisdiction to the Nation. We accordingly reverse the transfer order.

## I

### BACKGROUND

In addition to Larissa and Michael, Gina has five other children. The youngest three were declared dependent due to physical and emotional abuse and are in confidential placements with no reunification services ordered. Gina was convicted of and served prison time for child abuse. She was on probation for child abuse when this case was initiated. Her primary parenting problem was apparently an inability to control her anger.

Twins Larissa and Michael were born prematurely on August 23, 1994, to Gina and Clyde G., a registered Navajo Indian. Dependency petitions were filed on September 6, alleging abuse and neglect of the twins' half brother, Gina's son Rick L. Amended petitions filed on September 30 added allegations that Gina and Clyde engaged in violent confrontations, Clyde drank to excess, and Gina abused her daughter Megan L. and her husband's grandson Richard J.[3] On October 17, Gina submitted on the count alleged in the original petition. The court dismissed the remaining counts with an agreement it could consider them in rendering a dispositional order. Larissa and Michael were detained and then placed in foster care upon their release from the hospital. Both children had medical problems and were developmentally delayed.

## II

### SIX-MONTH REVIEW

According to the reports dated June and July 1995 that DSS prepared for the six-month review, Gina had been "very sporadic regarding compliance

---

[3]Gina was married to someone other than Clyde.

with her reunification plan." Her therapist said that she had "deteriorated substantially" and behaved erratically. Gina's meetings with the therapist had been infrequent and she had not attended therapy since April 1, 1995. She had threatened the therapist and the social worker and frequently failed to show up for visits with the twins. When Gina did visit, her interaction with the children varied from failing to remove them from their strollers or car seats to holding them and changing their diapers. Gina's relationship with Clyde was volatile and included fights for which the police were summoned. In December 1994, Gina spent a week in jail for hitting Clyde with a hammer. Gina and Clyde screamed at each other at a May 17, 1995, visit with the minors. Gina had not benefited from an anger management class.

At the July 19, 1995, six-month review, the court ordered that Gina's visits would commence when she demonstrated progress in her reunification plan, particularly therapy, and that if she failed to attend therapy regularly or the therapist felt it necessary, Gina would be required to take part in a 12-step program and substance abuse treatment and submit to chemical testing.

### III

### VISITATION*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV

### ICWA

On September 6, 1995, the court heard the Nation's request for a transfer of jurisdiction[5] and DSS's request for a change of placement to the home of the paternal aunt and uncle on the Navajo reservation in Arizona. Gina opposed the motions. The court concluded that Gina lacked veto power over the transfer decision, transferred jurisdiction, and ordered the children placed with the aunt and uncle.

### Contentions and Discussion

Gina contends that her objection to transfer of jurisdiction to the Nation operated as a veto and good cause precluded the transfer; the court

---

*See footnote 1, *ante,* page 505.

[5]The Nation had earlier agreed that the children might remain in their non-Indian foster home due to their medical needs. By the time of the September 1995 hearing, their medical condition had improved significantly and they were sufficiently medically stable to be moved.

erred in ordering the children placed with the relatives in Arizona, which made visitation difficult and thus jeopardized reunification; and the court erred in finding that the ICWA applied before determining paternity. We conclude that Gina had veto power over the transfer but that the placement order was proper, and that the remaining contentions are moot.

*Transfer of Jurisdiction*

Section 1911(b) provides in pertinent part: "In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: . . ."

The language of section 1911(b) appears plainly to give a parent the right to veto a transfer of jurisdiction. To determine whether such a reading is proper, we examine administrative guidelines regarding the section, cases from other jurisdictions interpreting it and the policy underlying the section.

■ Guidelines for aid in interpreting the ICWA, promulgated by the Bureau of Indian Affairs of the Department of the Interior, interpret this statutory language as follows:

". . . Upon receipt of a petition to transfer by a parent, Indian custodian or the Indian child's tribe, the court must transfer unless either parent objects to such transfer, the tribal court declines jurisdiction, or the court determines that good cause to the contrary exists for denying the transfer.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Since the Act gives the parents and the tribal court of the Indian child's tribe an absolute veto over transfers, there is no need for any adversary proceedings if the parents or the tribal court opposes transfer." (Guidelines for State Courts, Indian Child Custody Proceedings, 44 Fed.Reg. 67584, 67590-67591 (Nov. 26, 1979).)

While these guidelines were not intended to have binding legislative effect, their construction of the ICWA is entitled to great weight. (*Id.* at p. 67584; *In re Junious M.* (1983) 144 Cal.App.3d 786, 792, fn. 7 [193 Cal.Rptr. 40].)

Cases from other jurisdictions interpret section 1911(b) to confer on the parent veto power over transfer of jurisdiction. *Matter of Adoption of Baby Boy L.* (1982) 231 Kan. 199 [643 P.2d 168] concerns adoption of a child never domiciled in an Indian community born to a non-Indian mother and an Indian father. The court stated: "A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother." (*Matter of Adoption of Baby Boy L., supra*, 643 P.2d at p. 175.)

In *Matter of S.Z.* (S.D. 1982) 325 N.W.2d 53 the court considered parental rights termination proceedings involving the child of an Indian mother and non-Indian father not living on a reservation. The tribe was given proper notice and intervened. The parents objected to transfer to a tribal court. The Supreme Court of South Dakota reversed the transfer order in light of section 1911(b) holding: "This statute provides that objection by either parent will keep jurisdiction in the state court." (*Matter of S.Z., supra*, 325 N.W.2d at p. 56.) In *Brown on Behalf of Brown* v. *Rice* (D.Kan. 1991) 760 F.Supp. 1459 the district court concluded a tribal court's exercise of jurisdiction over part Indian children who had never lived on a reservation could not be pursuant to a transfer from the state court since: ". . . if a transfer was intended, the transfer was not 'pursuant to law.' Under the Indian Child Welfare Act, 25 U.S.C. 1911(b), a case involving children not domiciled on the reservation cannot be transferred from state court without the consent of the parents." (*Brown on Behalf of Brown* v. *Rice, supra*, 760 F.Supp. at p. 1463, fn. omitted.)

Finally, though most certainly not a holding on the issue, the United States Supreme Court has referred to a parent's veto power under the ICWA.

"Section 1911(b) . . . creates concurrent but presumptively tribal jurisdiction in the case of children not domiciled on the reservation: on petition of either parent or the tribe, state-court proceedings for foster care placement or termination of parental rights are to be transferred to the tribal court, except in cases of 'good cause,' *objection by either parent*, or declination of

jurisdiction by the tribal court." (*Mississippi Choctaw Indian Band* v. *Holyfield* (1989) 490 U.S. 30, 36 [104 L.Ed.2d 29, 38-39, 109 S.Ct. 1597], italics added.)[6]

Commentators agree. (E.g., Barsh, *The Indian Child Welfare Act of 1978: A Critical Analysis* (1980) 31 Hastings L.J. 1287, 1316-1317 & fn. 162; Jones, The Indian Child Welfare Act Handbook (1995) pp. 36, 47, fn. 40; Thorne, A review of The Purpose, Changes and Requirements of The Indian Child Welfare Act, A Handbook (1991) p. 8.)

These interpretations appear to us to be consistent with congressional intent. Section 1902 of the ICWA states: "The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs."

■ The United States Supreme Court has explained the ICWA's purpose as follows: "The ICWA . . . 'seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.' [H. R.Rep. No. 95-1386, 2d Sess., p. 23 (1978)]. It does so by establishing 'a Federal policy that, where possible, an Indian child should remain in the Indian community,' *ibid.*, and by making sure that Indian child welfare determinations are not based on 'a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family.' *Id.*, at 24." (*Mississippi Choctaw Indian Band* v. *Holyfield, supra,* 490 U.S. at p. 37 [104 L.Ed.2d at p. 39], fn. omitted.)

Two sometimes competing interests are involved: a parent's interest in raising a child as he or she sees fit and the tribe's interest in fostering its community by preserving Indian families. The ICWA accommodates these interests in two manners. As to Indian children domiciled on the reservation, the interests are presumed to coincide and section 1911(a) gives an Indian tribe exclusive jurisdiction over child custody proceedings. In such cases the

---

[6]*Mississippi Choctaw Indian Band* v. *Holyfield, supra,* 490 U.S. 30 involved the adoption of children whose parents were tribal members residing on the reservation. The mother left the reservation to give birth and both parents consented in state court to the adoption. (*Id.* at pp. 37-38 [104 L.Ed.2d at pp. 39-40].) The United States Supreme Court held that the state court lacked jurisdiction to enter the adoption decree because the children were domiciled on the reservation within the meaning of the ICWA. (*Id.* at pp. 48-49, 53 [104 L.Ed.2d at pp. 46-47, 49].)

tribe's interest in its children "is distinct from but on a parity with the interest of the parents." (*Matter of Adoption of Halloway* (Utah 1986) 732 P.2d 962, 969.)

When the child is domiciled off the reservation, relationships shift under the ICWA and the parents' interests may be primary.

"The tribe's interest in actions involving Indian children living off the reservation is not as great. A review of the ICWA's provisions supports this difference in the interests and rights between an Indian child's parents and his or her tribe. For example section 1911(b) grants a preference to tribal courts in foster care and parental termination matters where an Indian child resides or is domiciled off the reservation *'absent objection by either parent.'* (Italics added.) Also, section 1913(a) permits an Indian parent or custodian to voluntarily consent to a foster care placement or termination of parental rights without first notifying the tribe. Finally, under section 1915(c), the Indian parent's placement preference must be considered '[w]here appropriate.' " (*In re Baby Girl A.* (1991) 230 Cal.App.3d 1611, 1621 [282 Cal.Rptr. 105].)

In his dissenting opinion in *Mississippi Choctaw Indian Band* v. *Holyfield*, Justice Stevens discussed the parent's veto power and the ICWA's policy:

"The Act gives Indian tribes certain rights, not to restrict the rights of parents of Indian children, but to complement and help effect them. The Indian tribe may petition to transfer an action in state court to the tribal court, but the Indian parent may veto the transfer. § 1911(b)." (*Mississippi Choctaw Indian Band* v. *Holyfield, supra,* 490 U.S. at p. 57 [104 L.Ed.2d at p. 52], fn. omitted (dis. opn. of Stevens, J.).)

"Although parents of Indian children are shielded from the exercise of state jurisdiction when they are temporarily off the reservation, the Act also reflects a recognition that allowing the tribe to defeat the parents' deliberate choice of jurisdiction would be conducive neither to the best interests of the child nor to the stability and security of Indian tribes and families. Section 1911(b), providing for the exercise of concurrent jurisdiction by state and tribal courts when the Indian child is not domiciled on the reservation, gives the Indian parents a veto to prevent the transfer of a state-court action to tribal court. 'By allowing the Indian parents to "choose" the forum that will decide whether to sever the parent-child relationship, Congress promotes the security of Indian families by allowing the Indian parents to defend in the court system that most reflects the parents' familial standards.' Jones, [*Indian Child Welfare: A Jurisdictional Approach* (1979)] 21 Ariz.L.Rev. [1123,]

1141. As Mr. Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians, stated in testimony to the House Subcommittee on Indian Affairs and Public Lands with respect to a different provision:

" 'The ultimate responsibility for child welfare rests with the parents and we would not support legislation which interfered with that basic relationship.' Hearings on S. 1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong., 2d Sess., 62 (1978)." (*Mississippi Choctaw Indian Band* v. *Holyfield*, *supra*, 490 U.S. at pp. 60-61 [104 L.Ed.2d at p. 54], fn. omitted (dis. opn. of Stevens, J.)

 We conclude section 1911(b) accommodates the interests of the tribe and parents as to nonreservation children by affording the tribe certain rights, for example, rights to notice (§ 1912(a)) and intervention (§ 1911(c)) as well as placement preferences (§ 1915), and giving the parent the ultimate say over jurisdiction but an inability to prevent application of the ICWA in a state court proceeding. Therefore, granting the parent veto power over a request to transfer jurisdiction to the tribe does not frustrate the policy of the ICWA. Rather, the statutory scheme protects the tribe's significant rights in the Indian child while still honoring the parent's fundamental rights.

The Nation argues that legislative history demonstrates that Congress chose not to amend the ICWA to specify clearly a parental veto power. The legislative history of section 1911(b), however, shows an intent to confer such power. Justice Stevens, in his dissent in *Mississippi Choctaw Indian Band* v. *Holyfield*, *supra*, offers insight into this history:

"The explanation of [section 1911(b)] in the House Report [H. R.Rep. No. 95-1386, 2d Sess. (1978)] reads as follows:

" 'Subsection (b) directs a State court, having jurisdiction over an Indian child custody proceeding to transfer such proceeding, absent good cause to the contrary, to the appropriate tribal court upon the petition of the parents or the Indian tribe. Either parent is given the right to veto such transfer. The subsection is intended to permit a State court to apply a modified doctrine of *forum non conveniens*, in appropriate cases, to insure that the rights of the child as an Indian, the Indian parents or custodian, and the tribe are fully protected.' *Id.*, at 21.

"In commenting on the provision, the Department of Justice suggested that the section should be clarified to make it perfectly clear that a state court

need not surrender jurisdiction of a child custody proceeding if the Indian parent objected. The Department of Justice letter stated:

"'Section 101(b) should be amended to prohibit clearly the transfer of a child placement proceeding to a tribal court when any parent or child over the age of 12 objects to the transfer.' *Id.*, at 32.

"Although the specific suggestion made by the Department of Justice was not in fact implemented, it is noteworthy that there is nothing in the legislative history to suggest that the recommended change was in any way inconsistent with any of the purposes of the statute." (*Mississippi Choctaw Indian Band* v. *Holyfield*, *supra*, 490 U.S. at pp. 60-61, fn. 8 [104 L.Ed.2d at p. 54] (dis. opn. of Stevens, J.).)

We conclude that section 1911(b) gives the parent of an Indian child not domiciled or residing on the reservation veto power over any decision to transfer to the tribe's jurisdiction a proceeding for foster care placement or termination of parental rights. This conclusion supports the policy behind the ICWA by giving the parents, the persons best suited to determining the importance of the family's Indian connection, the option of defending in the court system most reflective of family standards. It additionally conforms to the legislative aim of balancing the interests of the tribe, when the child is not domiciled on the reservation, with those of the parents.

Because the court here erred in transferring jurisdiction to the Nation over Gina's objection, we reverse the transfer order. In view of our conclusion, we need not address Gina's contention that there existed good cause to deny the transfer request.

V, VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

VII

DISPOSITION

We reverse the juvenile court's six-month review order insofar as it suspended visitation and remand for a hearing on this issue. The children are to remain in their Arizona placement pending the outcome of the hearing.

*See footnote 1, *ante*, page 505.

The juvenile court's order transferring jurisdiction to the Nation is reversed. In all other respects the juvenile court's orders are affirmed.

Huffman, J., and McDonald, J., concurred.