[No. A047304. First Dist., Div. Three. Apr. 17, 1991.]

Adoption of LINDSAY C., a Minor.
DENNIS H., Plaintiff and Respondent, v.
MICHAEL S., Defendant and Appellant.

**COUNSEL**

David J. Simon for Defendant and Appellant.

Rita L. Swenor for Plaintiff and Respondent.

OPINION

**MERRILL, J.**—Michael S. is a full-blooded Native American Indian and the natural father of seven-year-old Lindsay C. who is the subject of these proceedings. Michael appeals from a judgment terminating his parental rights regarding the minor. As part of that judgment, the trial court found that Michael was not the "presumed father" within the meaning of Civil Code section 7004 and that the Indian Child Welfare Act of 1978 had no application to the facts of the case. We reverse.

I

Lindsay C. was born out of wedlock on September 3, 1983. Her biological mother and father, Linda and Michael, were not married. Nor had they ever lived together. They had sexual relations but no other kind of relationship. Michael was not present at Lindsay's birth. Michael is enrolled in the Little Lake Tribe in Covelo. Linda is non-Indian.

Following the minor's birth, Linda retained custody of the child. On occasion, she would take the child to Michael's mother's home for a visit. Michael was present during some of these visits. However, the record indicates that Michael never held the minor or called her his daughter. By the time Lindsay was 16 months old, Linda had stopped making these visits and it appears that there was no further contact of any kind between Michael and Lindsay.

In April 1985, the District Attorney of Humboldt County filed a paternity action against Michael. In response to the action, Michael insisted on certain blood tests being performed. After receiving the results of these tests, Michael stipulated to the fact that he was the child's natural father.

It is the mother's testimony that up to the present time, Michael has never initiated any contact with the minor. Michael testified, on the other hand, that when the child was around two or two and one-half years old, he telephoned Linda seeking permission to see Lindsay, but Linda refused. It is an uncontroverted fact that Michael has never provided any kind of support for the child, financial or otherwise. He has been unemployed for the past seven years.

In September 1986, Linda married Lindsay's stepfather, Dennis. Two years following the marriage, Dennis filed the instant petition to adopt the minor. Linda filed a voluntary consent form with the court formally indicating her consent to the adoption and, at the same time, reserving her rights as the minor's natural mother. Included as part of the petition are

allegations that Michael has wilfully failed to communicate with the child and to pay for her care and support although able to do so. Such allegations, if proven true, provide the court with a basis for granting the petition without Michael's consent under Civil Code section 224. The county probation department filed a "stepparent adoption report" recommending that the petition be granted.

Notice of the petition and a hearing to determine the truth of the allegations was served upon Michael. However, no notice was given to the Little Lake Tribe in Covelo. Michael appeared at the hearing and testified. He indicated his refusal to consent to the adoption and his intention to seek the custody of the minor. Michael stated that he lives in a house with his wife and their two children. He has enrolled these children as members of the Little Lake Tribe. Michael admitted that although Lindsay C. was eligible for enrollment, he had never attempted to enroll her. In addition to Michael's testimony, Michael's counsel filed a memorandum of points and authorities arguing the application of the Indian Child Welfare Act of 1978 (the Act) which generally requires in custody proceedings involving Indian children, notification of the child's tribe regarding the proceedings and an opportunity for the tribe to intervene. This memorandum was prepared by an attorney representing the Indian Child Welfare Act Project who was present at the hearing.

Following the hearing, the trial court found that Michael was not the "presumed father" of Lindsay C. within the meaning of Civil Code section 7004, subdivision (a); that he wilfully failed to communicate with the minor for a period in excess of one year; that he never paid any support for the child; and that, accordingly, the adoption could proceed without Michael's consent pursuant to Civil Code section 224. The court then provided petitioner with time to file briefing on the question of the applicability of the Act and took that issue under submission. Thereafter, by separate ruling, the court issued its determination that the Act had no application to the facts of the case. It then entered judgment finding that it would be in the best interest of the minor that Michael's parental rights be terminated. It ordered the termination of Michael's parental rights regarding Lindsay and directed that the adoption proceedings go forward without Michael's consent. Michael appeals.

## II

■ Michael claims reversible error based on the trial court's ruling that the Act is inapplicable to the facts of this case. We find his position meritorious.

The Act (25 U.S.C. §§ 1901-1963) was enacted ". . . to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, . . ." (25 U.S.C. § 1902.) The legislation was a response by Congress to its findings that "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions . . . ." (25 U.S.C. § 1901(4).)

Operation of the Act is triggered by a child custody proceeding, the subject of which is an Indian child. " '[C]hild custody proceeding,' " as that term is used in the Act, refers to proceedings for foster care placement, termination of parental rights, preadoptive placement, and adoptive placement. (25 U.S.C. § 1903(1).) " 'Indian child' " is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" (25 U.S.C. § 1903(4).) " 'Indian child's tribe' " refers to "(a) the Indian tribe in which an Indian child is a member or eligible for membership or (b), in the case of an Indian child who is a member of or eligible for membership in more than one tribe, the Indian tribe with which the Indian child has the more significant contacts[.]" (25 U.S.C. § 1903(5).) Finally, " 'Indian tribe' means any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians . . . ." (25 U.S.C. § 1903(8.))

The language of the Act makes but two exceptions: it does not apply to the custody provisions of a divorce decree or to delinquency proceedings. (25 U.S.C. § 1903(1).)

Regarding those proceedings which do come under the Act, the statute provides an Indian tribe with exclusive jurisdiction when the child resides or is domiciled within its reservation. Even where the child is not so domiciled, and a proceeding is initiated in a state court, the court must transfer the proceeding to the jurisdiction of the tribe under certain circumstances. (25 U.S.C. § 1911(b).) In cases which are not transferred, the tribe has the right to intervene in the state court proceedings. (25 U.S.C. § 1911(c).)

"Of course, the tribe's right to assert jurisdiction over the proceeding or to intervene in it is meaningless if the tribe has no notice that the action is pending. [Citation.]" (*In re Junious M.* (1983) 144 Cal.App.3d 786, 790-791

[193 Cal.Rptr. 40].) Section 1912 therefore provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. . . . No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe . . . : *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding." (25 U.S.C. § 1912(a).)

Violation of the notice provisions may be cause for invalidation of the proceedings. (25 U.S.C. § 1914.)

In the case at bar, it is uncontroverted that Lindsay C. is an Indian child within the meaning of the Act. It is also undisputed that the tribe of which Michael is a member is a tribe recognized under the Act and that Lindsay is eligible for membership therein. As noted, a "child custody proceeding" for purposes of the Act includes an action resulting in the termination of the parent-child relationship. Accordingly, by its own express terms, the Act is applicable to the facts before us.

Nevertheless, the trial court held the Act inapplicable. In so holding, the court said it was persuaded by the Kansas State Supreme Court's rationale in *Matter of Adoption of Baby Boy L.* (1982) 231 Kan. 199 [643 P.2d 168].

As in the case at bar, *Baby Boy L.* arose out of adoption proceedings involving an illegitimate Indian child. The infant's biological father was five-eighths blood Indian and an enrolled member of the Kiowa Tribe. His biological mother was a non-Indian, who on the date of the birth, executed a voluntary consent to the baby's adoption expressly limited to one couple. The couple immediately filed a petition for adoption in the state court and was given temporary custody of the child. The child's biological father, who was incarcerated in a state penal institution at the time of the infant's birth, never saw the child before the couple took custody. He was notified of the adoption proceedings, however, and was represented by counsel therein. During the course of the proceedings the court became aware of the possibility that the Act might apply. It recessed the hearings so that the Kiowa Tribe could be notified. The tribe filed a motion to intervene. It also enrolled the child as a member of the tribe over the objection of the biological mother. After considering briefs filed by the tribe and the petitioners, the court held that the Act did not apply and denied the tribe's motion to intervene on that basis. The court then found the child's biological father to

be an unfit parent and severed his parental rights. It granted the petition for adoption.

Thereafter, the tribe appealed the denial of its motion to intervene to the Kansas Supreme Court. That court upheld the lower court's decision finding that the Act, by its terms, was inapplicable to the case. The court said, "A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother. Section 1902 of the Act makes it clear that it is the declared policy of Congress that the Act is to adopt minimum federal standards 'for the removal of Indian children from their [Indian] families.' Numerous provisions of the Act support our conclusion that it was never the intent of Congress that the Act would apply to a factual situation such as is before the court." (*Matter of Adoption of Baby Boy L.*, *supra*, 643 P.2d at p. 175.)

The Kansas Supreme Court next identified a number of provisions within the Act which it said "reflect the underlying thread that runs throughout the entire [statute] to the effect that the Act is concerned with the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family." (*Matter of Adoption of Baby Boy L.*, *supra*, 643 P.2d at p. 175.) It then concluded, "In this case Baby Boy L. is only 5/16ths Kiowa Indian, has never been removed from an Indian family and so long as the mother is alive to object, would probably never become a part of the [father's] or any other Indian family. While it is true that this Act could have been more clearly and precisely drawn, we are of the opinion that to apply the Act to a factual situation such as the one before us would be to violate the policy and intent of Congress rather than uphold them." (*Ibid.*)

Decided in 1982, *Baby Boy L.* was one of the first cases nationally to interpret the Act and to determine the scope of its provisions. It became the lead case in a growing number of decisions seeking to carve out a judicial exception to their reach. Generally speaking, these cases hold the Act inapplicable in adoption proceedings involving an illegitimate Indian child who has never been a member of an Indian home or Indian culture, and who is being given up by his or her non-Indian mother. (See, e.g., *Matter of Adoption of T.R.M.* (Ind. 1988) 525 N.E.2d 298: *In Interest of S.A.M.*

(Mo.Ct.App. 1986) 703 S.W.2d 603; *Matter of Adoption of Baby Boy D* (Okla. 1985) 742 P.2d 1059; and *Matter of Appeal in Maricopa County* (1983) 136 Ariz. 528 [667 P.2d 228].)

However, not all courts have adopted this view. Its soundness has, in fact, been called into question more than once. (See *Matter of Adoption of a Child of Indian Heritage* (1988) 111 N.J. 155 [543 A.2d 925]; and *In re Custody of S.B.R.* (1986) 43 Wn.App. 622 [719 P.2d 154].) One event serving to accelerate this scrutiny is the United States Supreme Court decision *Mississippi Choctaw Indian Band* v. *Holyfield* (1989) 490 U.S. 30 [104 L.Ed.2d 29, 109 S.Ct. 1597]. *Holyfield* represents the high court's first opportunity to examine the Act and its legislative history.

*Holyfield* concerned the status of twin illegitimate babies, whose parents were enrolled members of the Choctaw Tribe and residents and domiciliaries of the Choctaw Reservation in Mississippi. The twins were born off the reservation in a town some 200 miles away. Following the twins' births, both parents executed consent-to-adoption forms on behalf of a non-Indian couple, the Holyfields. An adoption decree was entered by a county court. Subsequently, the Choctaw Tribe filed a motion with the court to vacate the adoption decree on the grounds that exclusive jurisdiction over the matter was vested in that tribe's tribal court under the Act. The county court denied the motion. The Mississippi Supreme Court affirmed, holding that the twins were not "domiciled" on the reservation under state law. In reaching its decision, the state court placed particular emphasis on the fact that the twins had never been physically present on the reservation and that they had been "voluntarily surrendered" by their parents who went to some efforts to see that they were born off the reservation and promptly arranged for their adoption.

The United States Supreme Court reversed. The high court held that although the Act does not define "domicile," Congress clearly intended a uniform federal law of domicile to apply and did not intend for the definition of the word to be a matter of state law. It said the Act's purpose was, in part, to make clear that in certain situations the state courts did not have jurisdiction over child custody proceedings. "Indeed, the congressional findings that are a part of the statute demonstrate that Congress perceived the States and their courts as partly responsible for the problem it intended to correct." (*Mississippi Choctaw Indian Band* v. *Holyfield*, *supra*, 490 U.S. at p. 45 [104 L.Ed.2d at p. 44].)

Pointing to well-established common law principles of domicile, the *Holyfield* court found that the twins assumed the domicile of their mother.

And since the mother was indisputably domiciled on the reservation, so were they. (490 U.S at pp. 48-49 [104 L.Ed.2d at pp. 46-47].) The court added, "Nor can the result be any different simply because the twins were 'voluntarily surrendered' by their mother. Tribal jurisdiction under [the Act] was not meant to be defeated by the actions of individual members of the tribe, for Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians." (*Id.*, at p. 49 [104 L.Ed.2d at p. 47].)

Citing the "substantive" provisions of the Act which accord the tribes "numerous prerogatives," the *Holyfield* court said that these provisions must "be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves." (490 U.S., at p. 49 [104 L.Ed.2d at p. 47].) It said, "In addition, it is clear that Congress' concern over the placement of Indian children in non-Indian homes was based in part on evidence of the detrimental impact on the children themselves of such placements outside their culture. Congress determined to subject such placements to [the Act's] jurisdictional and other provisions, even in cases where the parents consented to an adoption, because of concerns going beyond the wishes of individual parents. . . . [¶] These congressional objectives make clear that a rule of domicile that would permit individual Indian parents to defeat [the Act's] jurisdictional scheme is inconsistent with what Congress intended." (*Id.*, at pp. 49-51 [104 L.Ed.2d at pp. 47-48], fns. omitted.)

In conclusion, the *Holyfield* court, quoting from the Utah Supreme Court's decision in *In re Adoption of Halloway* (1986) 732 P.2d 962, said, "'. . . [State] abandonment law cannot be used to frustrate the federal legislative judgment expressed in [the Act] that the interests of the tribe in custodial decisions made with respect to Indian children are as entitled to respect as the interests of the parents.' [Citation.]" (490 U.S., at p. 53 [104 L.Ed.2d at p. 49].)

As noted, *Holyfield* has raised new questions regarding the continuing viability of *Baby Boy L.* and its progeny. As stated by one legal scholar, "After the decision in *Holyfield*, it appears that the Kansas court in *Baby Boy L.* may have given inappropriate weight to the wishes of the family. The United States Supreme Court seems unlikely to protect the *implied* right of the non-Indian mother to entirely exclude the applicability of the Act which *explicitly* protects the right of a tribe to intervene in any child custody proceeding involving an Indian child." (Tellinghuisen, *The Indian Child*

*Welfare Act of 1978: A Practical Guide with [Limited] Commentary* (1989) 34 S.D.L.Rev. 660, 671.)

In the wake of *Holyfield*, the South Dakota Supreme Court which previously followed the reasoning of *Baby Boy L.*, appears to have diverged from that line of thinking. In *Claymore* v. *Serr* (S.D. 1987) 405 N.W.2d 650, 653, that court had held the Act inapplicable in the case of an illegitimate child who had never been a member of an Indian home or culture and who was the subject of a child custody proceeding. However, more recently, in *Matter of Adoption of Baade* (S.D. 1990) 462 N.W.2d 485, 490, the same court held that the applicability of the Act is contingent only upon whether an "Indian child" is the subject of a "child custody proceeding" as those terms are defined by the Act.

And in California, the Court of Appeal, Third Appellate District, in *In re Crystal K.* (1990) 226 Cal.App.3d 655 [276 Cal.Rptr. 619] (review den. Mar. 14, 1991) differentiated the facts of that case from *Baby Boy L.* as well. *Crystal* concerns a child who was born in Anchorage, Alaska, in 1981. The child's biological mother was non-Indian, her biological father Indian. In 1982, the mother and father separated. Thereafter, the mother took the child to California where she obtained a dissolution of marriage in 1983. In 1985, the mother remarried. Two years later, the mother petitioned the court to have the child declared free from the biological father's parental custody and control. The mother alleged that the father had not provided any support for the minor since April of 1983, and had had virtually no contact with her.

The Native Village of Chanoga Tribe, of which the minor was a member, moved to intervene in the case and the motion was granted. The tribe moved for judgment on the pleadings on the grounds that the mother's petition failed to state facts sufficient to constitute a cause of action in that the petition did not show compliance with minimum federal standards for termination of parental rights as required by the Act. The court granted the motion with leave to amend.

In her amended petition, the mother alleged that the biological father drank to excess, was abusive to her, and that the two had separated only after all remedial and rehabilitative efforts failed. She further alleged that the child did not know her biological father, had not lived with him since she was one year old, and considered her stepfather to be her actual father. The mother claimed that continuation of the biological father's custodial rights would likely result in serious emotional or physical injury to the minor.

At trial, the parties stipulated that the termination of the parent and child relationship would result in the minor's loss of membership in the tribe and all benefits of such membership including higher education benefits.[1]

Following a hearing at which all of the respective parties testified, the trial court granted the petition finding that the father had abandoned the minor and that it would be detrimental for the child within the meaning of California law to not grant the petition. The court held the Act inapplicable.

The Court of Appeal reversed. First, the appellate court rejected the basis of the trial court's action which was to analogize the case to a divorce proceeding which, under the terms of the Act, is specifically exempted from the statute's coverage. The appellate court said, "This view was grounded in the belief that the Act applies only to custody proceedings involving the removal of Indian children from their homes by nonfamily entities. In short, the view is that the Act does not apply to intrafamily custody disputes." (*In re Crystal K.*, *supra*, 226 Cal.App.3d at p. 664.) In rejecting such an analogy, the court said, "This view is simply incorrect and ignores the plain language of the [statute]. A 'child custody proceeding' for purposes of the Act includes '*any* action resulting in the termination of the parent-child relationship.' [Citation.] The excluding language, i.e., 'a *placement* based . . . upon an award, in a divorce proceeding, of custody to one of the parents' (italics added), on its face means a custody dispute involving a placement in a divorce proceeding. Congress delineated the only exclusions and judicially created exclusions cannot be added. [Citations.]" (*In re Crystal K.*, *supra*, 226 Cal.App.3d at pp. 663-664.)

The court went on to state, "We think the purpose of the [Act] set forth in sections 1901 and 1902—to govern the removal of Indian children from their families through the application of standards that recognize the distinct Indian culture—is broad enough to encompass the parental termination proceeding before us. . . .

". . . . . . . . . . . . . . . . . . .

"Limiting the Act's applicability solely to situations where nonfamily entities physically remove Indian children from actual Indian dwellings deprecates the very links—parental, tribal and cultural—the Act is designed to preserve." (*In re Crystal K.*, *supra*, 226 Cal.App.3d at pp. 665-666.)

---

[1] For purposes of the record, we note that it is unclear in the case at bench whether termination of appellant's parental rights would have such ramifications.

*Crystal* is the only California case we have found regarding the applicability of the Act following *Holyfield*. Prior to *Holyfield*, this court itself had an occasion to address the subject. In *In re Junious M., supra*, 144 Cal.App.3d 786, we found the Act applicable to a Civil Code section 232 proceeding filed by the county to terminate the parental rights of a mother regarding a child who, it was contended, was Indian. The trial court had found the Act inapplicable in part because the child had developed no Indian identification. Commenting on the reasoning of the trial court we said, "The language of the Act contains no such exception to its applicability, and we do not deem it appropriate to create one judicially. [Citation.]" (144 Cal.App.3d, at p. 796.)

### III

Turning now to the case before us, we consider the applicability of the Act to the instant set of facts. In holding the Act inapplicable in reliance on *Baby Boy L.*, the trial court stated: "The Court finds that the Indian Child Welfare Act has no application to the factual situation here. This stepparent adoption petition concerns the illegitimate child of a non-Indian mother. The child has always resided with the non-Indian mother, and has resided for the past three years in the home of the non-Indian mother and her present husband. The child has never been in the care or custody of the natural father, nor had any connection with the Indian culture. The issue of the preservation of the Indian family is not involved, as the child has never been a part of any Indian family relationship."

Our review of the pertinent authorities convinces us that the trial court erred in its ruling. First, by its own express terms the Act is applicable to the case. It is uncontroverted that Lindsay is an Indian child within the meaning of the Act; that the Little Lake Tribe in Covelo of which Michael is a member is a tribe recognized under the Act; and that Lindsay is currently eligible for membership therein. (25 U.S.C. § 1903(4), (5) and (8).) Finally, a "child custody proceeding" for purposes of the Act includes an action resulting in the termination of the parent-child relationship. (25 U.S.C. § 1903(1).)

This case does not fall within one of the two specific exclusions under the Act (i.e., divorce or delinquency proceedings (25 U.S.C. § 1903(1)). Nor does there appear to be any other basis for exclusion.

Furthermore, applying the Act to the instant case, we find, advances the stated purposes of the legislation—i.e., "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families . . . ." (25 U.S.C. § § 1902.)

Additionally, it is in keeping with the tenor of *Holyfield* which stresses consideration of not only the wishes of the parents, but the well-being and interests of the child and the tribe.

Under the Act, notice of the instant proceedings must be given to the Little Lake Tribe in Covelo. Once notified, the tribe will have the opportunity to determine whether it wishes to intervene. Nothing which has been said in this opinion is meant to suggest that the tribe should intervene or, if it does, that it will necessarily prevail on the positions it takes.

## IV

The judgment terminating Michael's parental rights is reversed. Upon remand, the trial court is directed to give the Little Lake Tribe in Covelo notice of the adoption proceedings and of its right to intervene.

Michael shall be awarded his costs on appeal.

White, P. J., and Strankman, J., concurred.

Respondent's petition for review by the Supreme Court was denied July 11, 1991. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.