*In re* ADOPTION OF S.S. *et al.*, Minors (Leslie Scarlotte Tubridy *et al.*, Petitioners-Appellees, v. Betty Jo Ironbear, Respondent-Appellant (Fort Peck Tribes *et al.*, Appellants)).

Second District   Nos. 2—93—0078, 2—93—0101 cons.

Opinion filed October 22, 1993.

Tim S. Rigsbee, Sarah Megan, and Barnard Shapiro, all of Prairie State Legal Services, of St. Charles (Kathryn M. Bettcher, of counsel), for appellant Betty Jo Ironbear.

Gary M. Beaudry, of Fort Peck Tribes, of Poplar, Montana, for appellants Fort Peck Assiniboine and Sioux Tribes.

Bruce D. Strom, of Strom & Repay, of Elgin, for appellees.

JUSTICE QUETSCH delivered the opinion of the court:

On November 24, 1992, petitioners, Leslie Scarlotte Tubridy and Patrick Tubridy, filed a verified petition for adoption in the circuit court of Kane County, seeking to adopt S.S. and R.S., the minor children of Ms. Tubridy's recently deceased brother and respondent, Betty Jo Ironbear. The petition alleged that Ironbear was an unfit person to have custody of S.S. and R.S. and sought to terminate Ironbear's parental rights. Shortly thereafter, Ironbear and the Fort Peck Assiniboine and Sioux Tribes (Fort Peck Tribes) filed separate motions to transfer the case to the Fort Peck tribal court pursuant to section 1911 of the Indian Child Welfare Act of 1978 (ICWA or Act) (25 U.S.C. §1911 (1989)). Following the denial of the motions, Ironbear and the Fort Peck Tribes separately petitioned this court for leave to appeal pursuant to Supreme Court Rule 306(a)(1)(v) (134 Ill. 2d R. 306(a)(1)(v)). We granted the petitions and consolidated the appeals.

The issues raised for review are: (1) whether the trial court erred in concluding that the ICWA is inapplicable to this case, and (2) whether the trial court erred in determining that S.S. and R.S. were not domiciled on the Fort Peck tribal reservation.

We note that the record on appeal at this early stage of the proceedings consists essentially of the petition for adoption, the motions to transfer the case to the tribal court and a petition filed by Ironbear for an emergency order of protection pursuant to the Illinois Domestic Violence Act of 1986 (750 ILCS 60/101 et seq. (West 1992)), alleging that the Tubridys and others concealed and abducted S.S. and R.S. At this point, there are no responses to either the adoption petition or Ironbear's petition for an order of protection. The motions to transfer are not supported by affidavit and no evidentiary hearing

was conducted on these motions. Nonetheless, the parties have essentially acceded to this level of informality in establishing the relevant facts, and for the most part it appears that the significant facts are not substantially in dispute.

It is undisputed that Ironbear is a member of the Fort Peck Tribes. The children's father was a non-Indian, and he and Ironbear were never married. According to the Tubridys, the father established paternity in 1990 in separate proceedings in the circuit court of Kane County. Apparently, in connection with these proceedings a joint parenting agreement was approved pursuant to which (according to Ironbear) the father was awarded physical care of the children for 10 months of the year and Ironbear was awarded physical care for the summer months. In April 1992, the circuit court of Kane County granted the father's petition to terminate Ironbear's summer visitation. Ironbear states that the order terminating visitation was entered by default because she failed to appear. None of the orders in those separate proceedings appears in the record on appeal.

It appears both children resided in Illinois with their father and a paternal aunt (not Ms. Tubridy) at the time of the father's death in November 1992. In her motion to transfer, Ironbear states that S.S. and R.S. are members of the Fort Peck Tribes.

We note that the record reveals one significant matter of disagreement between Ironbear and the Tubridys. In the adoption petition, the Tubridys allege that Ironbear is a domiciliary of Kane County. In contrast, in her motion to transfer, Ironbear represents that she resides on the Fort Peck Indian Reservation in Poplar, Montana. The appellate arguments of both parties reflect the assumption that Ironbear resides on the reservation, and at oral argument the parties agreed that there is no factual dispute in this regard. Thus we conclude that the Tubridys may be viewed as having abandoned the allegation that Ironbear is domiciled in Kane County.

We first consider the trial court's determination that under the circumstances of this case the ICWA is inapplicable. Ironbear and the Fort Peck Tribes contend that this ruling is contrary to the language and policies of the ICWA. The Tubridys respond that the ICWA was designed to prevent the breakup of Indian families and that applying the ICWA in the case at bar would not advance this objective, since, according to the Tubridys, the children are not part of an existing Indian family. Whether an exception to the applicability of the ICWA should be recognized in cases where the children are not part of an "Indian family" is a question of first impression in this State. As dis-

cussed below, courts in jurisdictions where the issue has been considered are sharply divided as to the propriety of this approach.

At issue in the present appeal is the applicability of section 1911 of the ICWA. (25 U.S.C. §1911 (1989).) Section 1911(a) provides, in pertinent part, "[a]n Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law." (25 U.S.C. §1911(a) (1989).) Alternatively, pursuant to section 1911(b), "[i]n any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe." (25 U.S.C. §1911(b) (1989).) Pursuant to these provisions, the ICWA "provid[es] for exclusive tribal jurisdiction over custody proceedings involving Indian children who were domiciled or residing within a tribal reservation and concurrent, but presumptively, tribal jurisdiction in other cases." *In re Adoption of Crews* (1992), 118 Wash. 2d 561, 568, 825 P.2d 305, 309.

The term "Indian child" means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. §1903(4) (1989).) "Child custody proceeding" encompasses "foster care placement," "termination of parental rights," "preadoptive placement," and "adoptive placement," as those terms are variously defined. (25 U.S.C. §1903(1) (1989).) Accordingly, under the language of the statute, the applicability of the jurisdiction principles in section 1911 depends on the nature of the proceedings, the child's age and whether the child is (1) a member of the tribe, or (2) eligible for membership and the biological child of a member of the tribe. None of the applicable provisions impose any sort of threshhold requirement that the proceedings involve an "Indian family" or that the child have any particular contact with the tribe or with his or her tribal heritage. The Tubridys seek that we impose such a limitation, based not on the language of the ICWA, but on the policies (as the Tubridys interpret them) that Congress had in mind in enacting the statute.

The Tubridys rely on a line of cases originating with *In re Adoption of Baby Boy L.* (1982), 231 Kan. 199, 643 P.2d 168, in which courts have deemed it appropriate to consult the policies underlying

the ICWA and have held the ICWA to be inapplicable in circumstances where, in the court's view, applying the ICWA's provisions would not serve those policies. *Baby Boy L.* involved proceedings for the adoption of a child born out of wedlock to an non-Indian mother and an Indian father. The mother consented to the child's adoption on the day the child was born. On the same day, prospective adoptive parents filed a petition for adoption which, as later amended, sought to terminate the father's parental rights. The Kiowa Tribe of Oklahoma sought to intervene, and the father and the tribe sought, *inter alia,* transfer of the case to the tribal court. Finding the ICWA inapplicable, the trial court denied the tribe's request to intervene and declined to transfer the case. The supreme court of Kansas affirmed on the basis of its view of Congress' objectives in enacting the ICWA:

> "[T]he overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, *and probably never would be,* should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother." (Emphasis added.) 231 Kan. at 205-06, 643 P.2d at 175.

The court took note of Congress' express findings and declaration of policy set forth in sections 1901 and 1902 of the ICWA. (*Baby Boy L.,* 231 Kan. at 206, 643 P.2d at 175.) Section 1901(4) sets forth Congress' express finding "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." (25 U.S.C. §1901(4) (1989).) Similarly, section 1902 declares:

> "[I]t is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture ***." 25 U.S.C. §1902 (1989).

The *Baby Boy L.* court also identified various sections of the statute which, in the court's view, "reflect the underlying thread that runs throughout the entire Act to the effect that the Act is concerned

with the removal of Indian children from an existing family unit and the resultant breakup of the Indian family." (*Baby Boy L.*, 231 Kan. at 206, 643 P.2d at 175.) Applying this reasoning, the court observed that, "In this case Baby Boy L. is only 5/16ths Kiowa Indian, has never been removed from an Indian family and so long as the mother is alive to object, would probably never become part of the [father's] or any other Indian family." (231 Kan. at 206, 643 P.2d at 175.) We note that, while in the case at bar the Tubridys advocate a rule that the ICWA does not apply where the child is not presently and has not in the past been raised in or exposed to an Indian environment, the supreme court of Kansas additionally considered the likelihood that the child might be raised in an Indian environment in the future.

In *In re Adoption of D.M.J.* (Okla. 1985), 741 P.2d 1386, the supreme court of Oklahoma found the Act inapplicable where a non-Indian mother who had been awarded custody of her child following her divorce from the child's Indian father sought to place the child for adoption without the father's consent. The court noted that "[t]he Indian Child Welfare Act comes into play *** when we are confronted with the removal of Indian children from Indian families. The purpose of the Act is to promote the best interest of Indian children through promoting the stability and security of Indian tribes and families by the establishment of minimum federal standards for the removal of Indian children from their families." (741 P.2d at 1388.) The court concluded that "the ICWA applies only in those situations where Indian children are being removed from existing Indian family environments. Under the facts of this case where the Indian child since 1976 has been in the custody of her non-Indian mother, where the child is not being removed from the custody of an Indian parent, and is not being removed from an Indian environment, the ICWA does not apply." 741 P.2d at 1389.

In *In re Adoption of Crews* (1992), 118 Wash. 2d 561, 825 P.2d 305, an Indian mother, who had initially consented to the termination of her parental rights and the adoption of her natural child, later opposed the adoption and sought to have the order terminating her parental rights vacated on the basis of noncompliance with the ICWA. The mother's deposition testimony established that she was unaware of her Indian ancestry until after her child was born and had only researched her heritage in order to reinstate her parental rights. She also testified that her family did not regularly participate in Indian practices or events. The court examined the policies underlying the Act, noting that it was enacted "to counteract the large scale separations of Indian children from their families, tribes, and culture

through adoption or foster care placement, generally in non-Indian homes." (118 Wash. 2d at 567, 825 P.2d at 308.) The court specifically identified the tribal interest at stake:

"These separations not only affected Indian children and their parents, but also the various Indian tribes.

'Culturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People....'

[*Mississippi Band of Choctaw Indians v.*] *Holyfield* [(1989)], 490 U.S. [30,] 34, 109 S. Ct. [1597,] 1600-01 (quoting Hearings on S. 1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong., 2d Sess., at 193 (1978))." *Crews,* 118 Wash. 2d at 567-68, 825 P.2d at 309.

In light of these policies, the court observed:

"Neither [the mother] nor her family has ever lived on the Choctaw reservation in Oklahoma and there are no plans to relocate the family from Seattle to Oklahoma. [The child's father] has no ties to any Indian tribe or community and opposes [the child's] removal from his adoptive parents. *Moreover, there is no allegation by [the mother] or the Choctaw Nation that, if custody were returned to [the mother, the child] would grow up in an Indian environment. To the contrary, [the mother] has shown no substantive interest in her Indian heritage in the past and has given no indication this will change in the future.*

While [the child] may be an 'Indian child' based on the Choctaw Constitution, we do not find an existing Indian family unit or environment from which [the child] was removed *or to which he would be returned.* To apply ICWA in this specific situation would not further the policies and purposes of ICWA." (Emphasis added.) 118 Wash. 2d at 569, 825 P.2d at 310.

Again we note the court's emphasis not only on the child's past and present ties to the Indian community, but also on whether such ties might be established in the future. With these considerations in mind, the court carefully delimited its holding:

"We are not unmindful that prior abusive child welfare practices may have cut off large numbers of persons from their Indian heritage. [Citation.] Furthermore, there may be instances where the application of ICWA would result in the placement of an Indian child back into an Indian environment. This is not the case before us. It is within the narrow circumstances presented

by the specific facts of this case that we find ICWA not applicable." (*Crews*, 118 Wash. 2d at 571, 825 P.2d at 311.)

This is a facet of the decision which the Tubridys have failed to recognize, and one which, as we discuss further below, is of no small significance given the circumstances of the case at bar.

Several other courts have likewise declined to apply the Act based upon examination of its underlying policies and the conclusion that applying the Act would not advance these policies. See *S.A. v. E.J.P.* (Ala. Ct. App. 1990), 571 So.2d 1187; *In re Adoption of T.R.M.* (Ind. 1988), 525 N.E.2d 298; *In re C.E.H.* (Mo. Ct. App. 1992), 837 S.W.2d 947; *In re S.A.M.* (Mo. Ct. App. 1986), 703 S.W.2d 603; *In re S.C.* (Okla. 1992), 833 P.2d 1249.

A number of decisions, however, have questioned the soundness of this approach, particularly in light of the policy analysis undertaken by the United States Supreme Court in *Mississippi Band of Choctaw Indians v. Holyfield* (1989), 490 U.S. 30, 104 L. Ed. 2d 29, 109 S. Ct. 1597. *Holyfield* involved the determination, for purposes of section 1911(a), of the domicile of twin children born out of wedlock to Indian parents. The parents were residents and domiciliaries of the Choctaw Reservation in Neshoba County, Mississippi, but traveled 200 miles away for the birth of their twins and then consented to the twins' adoption. After a final decree of adoption was issued in State court, the Choctaw tribe challenged the adoption, asserting that under the ICWA exclusive jurisdiction was vested in the tribal court. The resolution of the dispute depended on whether the twins were domiciled on the reservation. In connection with its determination of the domicile question, the Court examined the policies underlying the Act. The Court's observations emphasize Congress' concern not only with the interests of Indian parents and children but also with Indian tribes. For instance, the Court noted:

> "The numerous prerogatives accorded the tribes through the ICWA's substantive provisions, *e.g.*, §§1911(a) (exclusive jurisdiction over reservation domiciliaries), 1911(b) (presumptive jurisdiction over nondomiciliaries), 1911(c) (right of intervention), 1912(a) (notice), 1914 (right to petition for invalidation of state-court action), 1915(c) (right to alter presumptive placement priorities applicable to state-court actions), 1915(e) (right to obtain records), 1919 (authority to conclude agreements with States), must *** be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves." 490 U.S. at 49, 104 L. Ed. 2d at 47, 109 S. Ct at 1609.

The Court concluded that Congress intended a uniform Federal law of domicile for the ICWA (490 U.S. at 47, 104 L. Ed. 2d at 45, 109 S. Ct. at 1607) which, as applied to the particular facts of the case, ascribed the mother's domicile (the Choctaw reservation) to the twins. (490 U.S. at 48-49, 104 L. Ed. 2d at 46-47, 109 S. Ct. at 1608.) This conclusion was not affected by the fact that the children were "voluntarily surrendered" by the mother, since "[t]ribal jurisdiction under §1911(a) was not meant to be defeated by the actions of individual members of the tribe, for Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians." 490 U.S. at 49, 104 L. Ed. 2d at 47, 109 S. Ct. at 1608-09.

In *In re Adoption of Lindsay C.* (1991), 229 Cal. App. 3d 404, 280 Cal. Rptr. 194, the California Court of Appeal relied in part on *Holyfield*'s explanation of the Act's purposes in holding the Act applicable in proceedings for the adoption of the child by its stepfather. The child was born out of wedlock to a non-Indian mother and an Indian father. Although the natural father had never had any meaningful contact with the child, the court observed that applying the Act "is in keeping with the tenor of *Holyfield* which stresses consideration of not only the wishes of the parents, but the well-being and interests of the child and the tribe." 229 Cal. App. 3d at 416, 280 Cal. Rptr. at 201.

In *In re Baby Boy Doe* (1993), 123 Idaho 464, 849 P.2d 925, the supreme court of Idaho rejected the trial court's use of an "Indian family" test in a case which, again, involved the recurrent fact pattern of a child born out of wedlock to an Indian father (who has had little or no contact with the child) and a non-Indian mother who sought to place the child for adoption over the father's objection. In light of *Holyfield*, the court noted that "[i]n this case, application of an Indian family requirement would allow the non-Indian mother to circumvent application of ICWA and the tribe's interest in the child by making sure that the child is kept away from the reservation and out of contact with the father and his family. This would undermine the tribe's interest in its Indian children, which the Supreme Court recognized in [*Holyfield*]." (123 Idaho at 470, 849 P.2d at 931-32.) The court in *Baby Boy Doe* further stated:

> "We also reject application of an Indian family requirement because the provisions of ICWA do not contain any limitation based on where the child is located. Limiting ICWA to situations in which an Indian child is being removed from an exist-

ing Indian family is, therefore, a judicially created exception to ICWA. Congress passed ICWA to limit state court power by creating mandatory protective procedures and minimum evidentiary standards that must be applied in child custody proceedings concerning Indian children. In light of the structure and nature of ICWA, it is inappropriate to use a judicially created exception to circumvent the mandates of ICWA." 123 Idaho at 471, 849 P.2d at 932.

See also *In re Adoption of T.N.F.* (Alaska 1989), 781 P.2d 973, 977-78 ("[T]hese judicially-created exceptions to coverage of ICWA are somewhat suspect in light of the Act's purpose of imposing federal procedural safeguards. State courts must be particularly hesitant in creating judicial exceptions to a federal act which was enacted to counter state courts' prejudicial treatment of Indian children and communities").

After *Holyfield*, the supreme court of South Dakota, which had previously approved of an "Indian family" requirement (*Claymore v. Serr* (S.D. 1987), 405 N.W.2d 650), reconsidered this position because "it is incorrect, when assessing ICWA's applicability to a particular case, to focus only upon the interests of an existing family. [Citation.] Such a practice fails to recognize the legitimate concerns of the tribe that are protected under the Act." *In re Adoption of Baade* (S.D. 1990), 462 N.W.2d 485, 489, citing Tellinghuisen, *The Indian Child Welfare Act of 1978: A Practical Guide with [Limited] Commentary*, 34 S.D. L. Rev. 660, 666 (1989); see also *In re Dependency & Neglect of N.S.* (S.D. 1991), 474 N.W.2d 96, 100 n.6.

■■ ■ Having considered the reasoning of the various decisions discussed above, we conclude that the trial court erred in holding that the ICWA did not apply to the case at bar. We are troubled in no small measure by an approach which departs from the clear language of the statute based upon a generalized policy analysis. The provisions at issue are unambiguous and the case at bar is undeniably within their scope. There is no dispute that S.S. and R.S. are "Indian children" as defined by the ICWA. The proceedings here are "child custody proceedings" for purposes of section 1911(a), and because they involve termination of parental rights, the proceedings are also within the purview of section 1911(b). Thus, pursuant to the plain language of the Act, depending on where the children are domiciled, one or the other of these subsections will be applicable. Congress imposed no express requirement that children be part of an Indian family in order for these provisions to apply; this limitation on the scope of the ICWA

is entirely a judicial creation with no basis in the language of the ICWA.

Where the language of a statutory provision is clear, a court must give it effect. (*West v. Kirkham* (1992), 147 Ill. 2d 1, 6.) Courts cannot declare that the legislature did not mean what the plain language of the statute imports. (*Zimmer v. Village of Willowbrook* (1993), 242 Ill. App. 3d 437, 443.) As we have recently observed, "[t]he cardinal rule of all statutory construction, to which other rules are subordinate, is that the true intent and meaning of the legislature must be ascertained and given effect; the language used in statutes is the primary source for determining the intent, and where the language used is certain and unambiguous the proper function of the court is to enforce the statute as enacted." (*People v. Piat* (1992), 234 Ill. App. 3d 262, 266.) "When the statute is clear and unambiguous, courts will give the language its plain and ordinary meaning and will not read exceptions into the statute." (*McCuen v. Peoria Park District* (1993), 245 Ill. App. 3d 694, 697.) The analysis is not altered by the fact that Congress included express legislative findings and a policy statement in the ICWA. The policy section is available for clarification of ambiguous provisions of the statute, but may not be used for the creation of ambiguity. *Brown v. Kirk* (1976), 64 Ill. 2d 144, 152.

Similar reasoning is reflected in a concurring opinion in *In re Dependency & Neglect of N.S.* (S.D. 1991), 474 N.W.2d 96:

"While a statute should be construed according to its legislative intent when its terms are ambiguous, there is no need to reach back to what the legislature intended when a statute is unambiguous on its face. In fact, when a court ignores the clear provisions of a statute in reliance on what the court believes the legislature must have meant to say, the court is improperly engaging in judicial lawmaking.

* * *

25 U.S.C. §1903(4) states that an unmarried minor is an 'Indian child' for ICWA purposes if he is 'a member of an Indian tribe.' Since N.S. apparently is a member of the Cheyenne River Sioux Tribe, the provisions of ICWA apply to child custody proceedings involving N.S. There is simply no statutory requirement for N.S. to have been born into an Indian home or an Indian community in order to come within the provisions of ICWA, however much one might believe 25 U.S.C. §1903(4) *should have been* written that way. No amount of probing into what Congress 'intended' can alter what Congress *said*, in plain English, at 25 U.S.C. §1903(4)." (Emphasis in original.)

*N.S.*, 474 N.W.2d at 100-01 n.* (Sabers, J., specially concurring).

See also *In re D.M.J.* (Okla. 1985), 741 P.2d 1386, 1390 (Hodges, J., dissenting) ("The creation of a judicial exception such as the one urged by appellees and created by the majority is inappropriate where the Acts are clear and unambiguous").

In any event, even if it were appropriate to look beyond the plain language of the statute, our decision would be no different. We believe that the rule advocated by the Tubridys reflects an unduly narrow concept of the policies the ICWA was intended to advance. As the Supreme Court's decision in *Holyfield* clearly demonstrates, and as has been recognized by a number of courts, Congress enacted the ICWA not only to protect Indian children and parents, but also to protect the tribes themselves. Imposing an "existing Indian family" requirement under the circumstances of this case is "directly in conflict with the idea of tribal sovereignty and the policy of improving tribal ties reflected in ICWA." *In re Adoption of Quinn* (1993), 117 Or. App. 579, 583, 845 P.2d 206, 208 (*en banc*), *petition for review allowed* (1993), 316 Or. 142, 852 P.2d 838.

The Tubridys argue that *Holyfield* did not overrule cases approving the "existing Indian family" doctrine. While *Holyfield* did not involve the precise question of whether an existing Indian family is a threshhold requirement to the ICWA's applicability, the Court's observations regarding the policies underlying the Act are clearly applicable to the case at bar. The Tubridys also accuse Ironbear and the Fort Peck Tribes of extending the holdings of cases rejecting an Indian family test to "form an extreme position" that the Act gives "rights" to Indian tribes "equal" to the rights of both parents. The Tubridys do not support this statement by suggesting any meaningful distinction between those cases and the case at bar, and the position of Ironbear and the Fort Peck Tribes—that the Act should be applied as written—is hardly extreme. Nor do we find it particularly helpful to attempt to quantify "rights" given under the Act. "Congress has made the policy decision about the strength of the connection that a parent and child must have with the tribe for ICWA to apply—that the child be a member of the tribe or that the child be eligible for membership and the biological child of a member. [Citation.] It is not for state courts to add additional requirements ***." *Quinn*, 117 Or. App. at 584, 845 P.2d at 209.

Additionally, as support for the imposition of an existing Indian family requirement, the Tubridys suggest hypothetical scenarios where, they claim, literal application of the Act would lead to results

unintended by Congress. The Tubridys' reliance on hypothetical situations only serves to invite us to create an overly broad judicial exception; if the facts of this case do not support the creation of a judicial exception, then we have no occasion at present to create one.

We further observe that our conclusion that the Act applies to the case at bar is, in fact, consistent with certain of the principal decisions the Tubridys rely on. In *In re Adoption of Baby Boy L.* (1982), 231 Kan. 199, 206, 643 P.2d 168, 175, the court specifically noted that the child would probably never become part of an Indian family. Similarly, in *In re Adoption of Crews* (1992), 118 Wash. 2d 561, 825 P.2d 305, the supreme court of Washington expressly limited its decision to the facts before the court, noting that in other cases, "there may be instances where the application of ICWA would result in the placement of an Indian child back into an Indian environment." (118 Wash. 2d at 571, 825 P.2d at 311; see *In re Adoption of M.* (1992), 66 Wash. App. 475, 481, 832 P.2d 518, 521-22 (where tribe had petitioned to intervene, seeking to place Indian child with paternal aunt, a Navajo living on the reservation, *Crews* did not apply).) The case at bar is just such a case. Ironbear is a member of the Fort Peck Tribes and, it appears, lives on the reservation. The children may well be placed in an Indian environment. This is precisely the objective the ICWA sought to facilitate.

We note that the Tubridys' argument reflects, in large measure, the assumption that if this case is transferred, Ironbear will necessarily prevail in the tribal court. At this early stage of the proceedings, our task is "to decide the legal question of *who* should make the custody determination concerning these children—not what the outcome of that determination should be." (Emphasis in original.) (*Holyfield*, 490 U.S. at 53, 104 L. Ed. 2d at 50, 109 S. Ct. at 1611.) We have no reason to doubt that if the case is transferred, the tribal court will decide it fairly. The Tubridys also express the concern that if the Act is applied according to its plain language, Indian tribes will invoke the Act indiscriminately for the sole purpose of the increasing tribal membership. We cannot accept this premise. It is clear that Congress, in enacting the Act, did not share the Tubridys' suspicion of the Indian community.

■ Finally, we note that the Tubridys have suggested, in a cursory fashion, that application of the jurisdiction provisions of the ICWA might in some cases violate the fifth, tenth and fourteenth amendments to the United States Constitution. It would be imprudent for us to rule on significant constitutional issues on the basis of cursory and undeveloped arguments. We will not address the constitu-

tional arguments. We therefore hold that the trial court erred in finding that the ICWA was inapplicable.

Having concluded that the ICWA applies to the case at bar, we turn to the question of whether the Act places jurisdiction in the tribal court. In addition to holding that the Act did not apply to the case at bar, the trial court alternatively found that the children were not domiciled on the Fort Peck Indian Reservation, so that section 1911(a) did not apply. Ironbear and the Fort Peck Tribes challenge the trial court's finding regarding domicile. Ironbear alternatively argues that even if the children were domiciled off the reservation, transfer to the tribal court is mandated by section 1911(b). See generally *In re Armell* (1990), 194 Ill. App. 3d 31.

As discussed above, in *Mississippi Band of Choctaw Indians v. Holyfield* (1989), 490 U.S. 30, 104 L. Ed. 2d 29, 109 S. Ct. 1597, the United States Supreme Court determined that Congress intended a uniform Federal law of domicile for the ICWA. (490 U.S. at 47, 104 L. Ed. 2d at 45, 109 S. Ct. at 1607.) *Holyfield* involved the issue of the domicile of illegitimate twins whose parents, domiciliaries of an Indian reservation, had travelled away from the reservation for their birth. In giving content to the term "domicile" for purposes of the ICWA, the court stated "[t]hat we are dealing with a uniform federal rather than a state definition does not, of course, prevent us from drawing on general state-law principles ***. *** Accordingly, we find it helpful to borrow established common-law principles of domicile to the extent that they are not inconsistent with the objectives of the congressional scheme." (490 U.S. at 47-48, 104 L. Ed. 2d at 46, 109 S. Ct. at 1608.) The Court noted that under common-law principles domicile is not necessarily synonymous with residence, and one can reside in one place but be domiciled in another. 490 U.S. at 48, 104 L. Ed. 2d at 46, 109 S. Ct. at 1608.

The particular rule applicable to the twin children in *Holyfield* was explained as follows:

"Since most minors are legally incapable of forming the requisite intent to establish a domicile, their domicile is determined by that of their parents. [Citation.] In the case of an illegitimate child, that has traditionally meant the domicile of its mother." (490 U.S. at 48, 104 L. Ed. 2d at 46, 109 S. Ct. at 1608.)

Since the mother was a domiciliary of the reservation, so were the twins, notwithstanding the fact that they had never been physically present on the reservation since birth.

In the case at bar, we similarly look to common-law principles to determine the domicile of S.S. and R.S. The children resided with their father, and apparently were in his legal custody, at the time of his death. The fact that the father had established paternity of the children and had joint custody of them arguably complicates the question of the children's domicile prior to his death. In any event, it appears fairly certain that the children's domicile, prior to their father's death, would be the domicile of one or the other of their parents.

If the children's domicile was that of their mother, we cannot see how the death of the father would have any effect. On the other hand, it has been stated that at common law, "[a]t the death of the father an infant took the domicile of its mother." (*People ex rel. Noonan v. Wingate* (1941), 376 Ill. 244, 249. See also R. Leflar, American Conflicts Law §12, at 24 (1968) ("When the father dies, a child's domicile follows that of the surviving mother in the same fashion in which it previously followed the father's domicile").) It is of no consequence that the father was awarded joint custody of the children and that Ironbear's visitation rights had been terminated. As Ironbear notes, according to the Restatement (Second) of Conflicts of Laws §22, Comment *d* (1971):

> "A child's domicil, in the case of the divorce or separation of his parents, is the same as that of the parent to whose custody he has been legally given. \*\*\* Upon the death of the parent to whose custody the child has been awarded or with whom the child has been living, the child's domicil shifts to that of the other parent even though the latter is domiciled in another state."

The result should be no different upon the death of a custodial father whose right to joint legal custody was established in paternity proceedings. In the case at bar, although Ironbear's summer visitation rights were apparently terminated, her right to joint legal custody remained intact. However, pursuant to the Restatement rule, domicile would shift to Ironbear even if the children's father had sole custody.

■ Accordingly, even assuming, *arguendo*, that prior to the father's death the children shared his domicile, domicile shifted to that of Ironbear upon his death. Relying on *Donlon v. Miller* (1976), 42 Ill. App. 3d 64, the Tubridys attempt to resist this reasoning, arguing that these principles only create a presumption of domicile. *Donlon* involved a petition for the adoption of a child who had been left in the care of the petitioner from a week of age. When the child was six years old, the mother, who had previously only visited the child a couple of times during the first two years of the child's life, surrepti-

tiously left the State with the child. Petitioner then filed an adoption petition in the circuit court of La Salle County, precipitating the natural mother's objection that the trial court lacked subject-matter jurisdiction and *in personam* jurisdiction over the mother and child. In the course of its analysis, the appellate court referred to the concept of domicile:

"Although generally the domicile of an infant child is considered to be that of the child's parent or guardian (25 Am. Jur. 2d *Domicil* §§63-76 (1966)), we believe that [the child] could be said to have acquired the domicile of the petitioner under the peculiar circumstances of this case. For six years, since [the child] was a week old, she has been in the *de facto* care and custody of [petitioner]. *** If in fact there was a surreptitious removal of the child from the State by defendant, this alone should not operate to change the status of the child so far as domicile is concerned." (42 Ill. App. 3d at 71.)

*Donlon* involved a choice, for purposes of determining a child's domicile, between two living individuals, the natural mother and an individual with *"de facto* custody." We fail to see how the reasoning applies when a custodial parent dies and is survived by the other parent. In such a case, according to the rule recited above, the child's domicile becomes that of the surviving parent. We see no reason to depart from this principle. *Holyfield* permits resort to common-law domicile principles "to the extent that they are not inconsistent with the objectives of the congressional scheme." (490 U.S. at 48, 104 L. Ed. 2d at 46, 109 S. Ct. at 1608.) Section 1903(1) (defining "child custody proceeding") and section 1911(a) of the ICWA create a balance between State court and tribal court jurisdiction by excluding certain types of disputes, usually between parents, from the exclusive tribal jurisdiction. However, if a State court custody determination in a dispute between parents which is not subject to the ICWA could control the question of domicile, even after the death of the custodial parent, in subsequent custody proceedings otherwise subject to the ICWA, the balance would be sharply altered. In the present circumstances, we find application of the Restatement rule to be more in harmony with the purposes of the Act.

Accordingly, under section 1911(a) the Fort Peck tribal court has exclusive jurisdiction over this matter. In view of this determination, it is unnecessary to consider whether transfer would otherwise have been mandated under section 1911(b).

For the foregoing reasons, the judgment of the circuit court of Kane County is reversed, and the cause is remanded. Upon remand,

the trial court is directed to order that the case be transferred to Fort Peck Tribal Court in Poplar, Montana.

Reversed and remanded with directions.

BOWMAN, J., concurs.

COLWELL, J., dissenting:

I respectfully dissent. I would affirm the decision of the trial court on the application of the Indian Child Welfare Act of 1978 (ICWA or Act) (25 U.S.C. §1911 (1989)), but I would apply different reasoning. The trial court's order states that "the children are not, and never have been domiciled on an Indian reservation." The court apparently concluded on this basis that the ICWA did not apply to these proceedings. I believe that the facts in this case lend themselves to an application of the "existing Indian family doctrine," which renders the ICWA inapplicable to the case at hand. This is a question of first impression in Illinois which deserves careful consideration not only of proper application of the ICWA, but the welfare of the children involved.

Congress adopted the ICWA with the express purpose:

"[T]o protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture ***." 25 U.S.C. §1902 (1989).

Legislative history cited in previous similar cases indicates that the overriding concern of Congress and other proponents of the ICWA was to maintain the family and tribal relationships in existing Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. (See *In re Adoption of Baby Boy L.* (1982), 231 Kan. 199, 206, 643 P.2d 168, 175.) The ICWA was intended to counteract the large scale separation of Indian children from their family, tribe, and culture due to adoption or foster care placement in non-Indian homes. (*Mississippi Band of Choctaw Indians v. Holyfield* (1989), 490 U.S. 30, 49, 104 L. Ed. 2d 29, 47, 109 S. Ct. 1597, 1608-09.) The ICWA states that Congress specifically found:

"(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children

from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. §§1901 (4), (5) (1989).

I do not conclude that Congress intended the ICWA to dictate that the fate of children such as S.S. and R.S., who have had little contact with an Indian home or culture and have resided primarily with their father in another State, should be determined by the Indian tribe. Rather, I believe the ICWA is meant to be applied when Indian children are being removed from an existing Indian environment.

These proceedings concern S.S., age 5 years, and R.S., age 9 years. It is apparently undisputed that Ironbear and the children are all enrolled members of the Fort Peck Assiniboine and Sioux Tribes. Ironbear briefly resided with the children and their father in the past, although she and the father never married. Ironbear had been awarded physical care of the children for two months out of the year under a 1990 joint parenting agreement. The children resided with their father in Illinois during the rest of the year. However, Ironbear's physical care was terminated on April 20, 1992. The children continuously resided with their father thereafter until his death on November 19, 1992. The Tubridys, the children's paternal aunt and uncle, took the children into their home after the father's death and immediately filed a petition for adoption.

The facts indicate that the children lived the predominant part of their lives with their non-Indian father in Illinois. Their history does not present the type of situation where the ICWA was meant to be applied since the children were not separated from an existing Indian family, tribe, or culture. Rather, the facts are sufficient to apply an existing Indian family exception since the appropriate tribunal would be determining whether the children would be removed, not from a reservation, tribe, or Indian family, but rather from the family members with whom they have resided and an environment which they now consider to be home.

I appreciate the concern that our decision should be based only on the application of the ICWA, not on the fear that the tribal court would conclude that the children should reside on the reservation. I cannot speculate on the outcome of any proceeding in the tribal court

nor by this dissent do I suggest a lack of confidence in the tribal court.

I do not believe that the existing Indian family doctrine departs from the clear language of the statute and is a judicial creation with no basis in the language of the ICWA. (See 252 Ill. App. 3d at 42-43.) The justification for applying the existing Indian family doctrine comes from the stated purpose of the statute itself (see 25 U.S.C. §1902 (1989)), not from contrived derivations of the legislative findings or policy statements.

Several cases have determined that the ICWA was inapplicable because the adoption did not break up an existing Indian family. (*In re Adoption of T.R.M.* (Ind. 1988), 525 N.E.2d 298; *In re Baby Boy L.*, 643 P.2d at 175; *In re S.A.M.* (Mo. Ct. App. 1986), 703 S.W.2d 603; *In re S.C.* (Okla. 1992), 833 P.2d 1249.) The Oklahoma Supreme Court recently endorsed the existing Indian family doctrine, stating that it is not a judicially created exception to the application of the ICWA; rather, it is simply outside the scope of the ICWA. (*S.C.*, 833 P.2d at 1256.) The court concluded that the United States Supreme Court's decision in *Holyfield* should be confined to the domiciliary issues presented and did not overrule the existing Indian family doctrine, since "[e]xtending *Holyfield* to control placements occurring years after the child has already been away from its Indian family would not be consistent with the stated purposes of the ICWA." *S.C.*, 833 P.2d at 1255.

The court in *S.C.* also noted that, in 1987, amendments were presented by the Senate Committee on Indian Affairs which, if enacted, "would have made application of the ICWA mandatory regardless of whether the child had 'previously lived in Indian country, in an Indian cultural environment or with an Indian parent.'" (*S.C.*, 833 P.2d at 1255, quoting S. 1976, 100th Cong., 1st Sess. (1987), 133 Cong. Rec. S18532, S18533 (daily ed. Dec. 19, 1987) (proposed amendment to section 1903(1)).) The amendment failed, and the court in *S.C.* stated that Congress, being aware of the existing Indian family doctrine, refused to change the statutory language to eradicate this interpretation. (See *S.C.*, 833 P.2d at 1255.) Restricting the application of the ICWA to an existing Indian family does, therefore, have support from previous case law, the language of the ICWA itself, and Congress' refusal to amend the ICWA.

The majority quotes *In re Dependency & Neglect of N.S.* for the argument that the statute does not require that the children were born into an Indian home or community in order to come within the provisions of the ICWA. Conversely, the policy statements and other relevant statutory language also do not provide that children residing

in non-Indian homes who have had minimal contact with the reservation or Indian culture necessarily come within the purview of the ICWA. The facts in this case are different from the types of problems which were the catalyst for the ICWA since the children here would be adopted into the family with whom they currently reside, and such adoption would not involve the breakup of an existing Indian family.

I conclude that the ICWA does not apply to the case at bar; thus, I would affirm the trial court. It should be noted that the trial court's order appears to base its decision on the fact that it found the children were not residing or domiciled on the reservation. In fact, if the ICWA did apply, I agree with the majority that domicile of the children would be established on the reservation under the language of *Holyfield*. (See 252 Ill. App. 3d at 48.) However, since I believe the ICWA should not apply in the case at hand, the issue of domicile need not be determined for the disposition of this case.